Irving W. MARKS, Petitioner,

v.

ST. LUKE'S EPISCOPAL HOSPITAL, Respondent.

No. 07–0783.

Supreme Court of Texas.

Argued Sept. 11, 2008.

Decided Aug. 27, 2010.

James E. Doyle, Nancy Kimberly Bo-
hannon, Doyle Restrepo Harvin & Rob-
bins, L.L.P., Michael P. Doyle, Doyle Raiz-
ner, L.L.P., Nancy Kimberly Hoesl, Doyle
Restrepo Harvin & Robbins, L.L.P., Hous-
ton, TX, for Petitioner.

L. Boyd Smith Jr., Jennifer H. Davidow,
Vinson & Elkins LLP, Houston, TX, for
Respondent.

Justice MEDINA delivered the Court's
judgment and an opinion, in which Justice
HECHT joined, and in which Justice
WAINWRIGHT, Justice JOHNSON and
Justice WILLETT joined as to Parts I &
IV.

We grant the motion for rehearing,
withdraw our previous opinion and judg-

ment of August 28, 2009, and substitute the following in its place.

In this case we must decide whether a hospital patient's fall, allegedly caused by a defective or unsafe hospital bed, is a health care liability claim under former article 4590i of the Revised Civil Statutes.[1] Article 4590i, also known as the Medical Liability and Insurance Improvement Act, provides that health care liability claims, not accompanied by an expert report, may be dismissed with prejudice 180 days after filing, although a grace period is available under certain limited circumstances. The trial court concluded that the hospital bed claim here was a health care liability claim which it then dismissed because of the patient's failure to file a timely expert report. The trial court also denied the patient's request for a grace period. The court of appeals initially disagreed with the trial court, concluding that the patient's claim was not a health care liability claim. *See Marks v. St. Luke's Episcopal Hosp.*, 177 S.W.3d 255, 260 (Tex.App.-Houston [1st Dist.] 2005), *vacated*, 193 S.W.3d 575 (Tex.2006). Following our remand of the case, however, the court changed its mind and affirmed the trial court's judgment, with one justice dissenting. 229 S.W.3d 396. Because we agree that the underlying cause of action falls under the statutory definition of a health care liability claim, we affirm.

## I

Irving Marks underwent back surgery at St. Luke's Episcopal Hospital. Seven days later, while still recuperating from his surgery, Marks fell in his hospital room. He alleges that this fall was caused by the footboard on his hospital bed which collapsed as he attempted to use it to push himself from the bed to a standing position.

Marks sued the hospital, alleging that its negligence contributed to cause his fall. He complained that the hospital was negligent in: (1) failing to train and supervise its nursing staff properly, (2) failing to provide him with the assistance he required for daily living activities, (3) failing to provide him with a safe environment in which to recover, and (4) providing a hospital bed that had been negligently assembled and maintained by the hospital's employees.

The trial court concluded that Marks's petition asserted health care liability claims as defined under the Medical Liability and Insurance Improvement Act ("MLIIA"). *See* Tex.Rev.Civ. Stat. art. 4590i, § 1.03(a)(4) (defining health care liability claim).[2] Under the MLIIA, a health care liability claim must be substantiated

---

1. *See* Medical Liability and Insurance Improvement Act of Texas, Act of May 30, 1977, 65th Leg., R.S., ch. 817, 1977 Tex. Gen. Laws 2039, amended by Act of May 18, 1979, 66th Leg., R.S., ch. 596, 1979 Tex. Gen. Laws 1259, amended by Act of May 26, 1989, 71st Leg., R.S., ch. 1027, §§ 27, 28, 1989 Tex. Gen. Laws 4128, 4145, amended by Act of March 21, 1991, 72d Leg., R.S., ch. 14, § 284, 1991 Tex. Gen. Laws 42, 222, amended by Act of May 25, 1993, 73d Leg., R.S., ch. 625, 1993 Tex. Gen. Laws 2347, amended by Act of May 5, 1995, 74th Leg., R.S., ch. 140, 1995 Tex. Gen. Laws 985, amended by Act of June 1, 1997, 75th Leg., R.S., ch. 1228, 1997 Tex. Gen. Laws 4693, amended by Act of June 2,

1997, 75th Leg., R.S., ch. 1396, §§ 44, 45, 1997 Tex. Gen. Laws 5202, 5249, amended by Act of May 13, 1999, 76th Leg., R.S., ch. 242, 1999 Tex. Gen. Laws 1104, repealed by Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884.

2. Article 4590i was repealed after the filing of this case. *See* n. 1 *supra*. Similar medical liability legislation is now codified in Chapter 74 of the Texas Civil Practice and Remedies Code, affecting actions filed on or after September 1, 2003. *See* Tex. Civ. Prac. & Rem Code §§ 74.301–.303.

by a timely filed expert report. *Id.* § 13.01(d). Because Marks failed to file a timely expert report, the trial court granted the hospital's motion to dismiss.

The court of appeals initially reversed, concluding that Marks's allegations concerned "an unsafe condition created by an item of furniture" and thus related to "premises liability, not health care liability[.]" *Marks,* 177 S.W.3d at 259. The hospital appealed, filing its petition for review a few days before our opinion in *Diversicare General Partner, Inc. v. Rubio,* 185 S.W.3d 842 (Tex.2005), another case involving the scope of a health care liability claim under the MLIIA. After full briefing, we granted the hospital's petition without reference to the merits and remanded the case to the court of appeals for its reconsideration in light of *Diversicare. St. Luke's Episcopal Hosp. v. Marks,* 193 S.W.3d 575, 575 (Tex.2006) (per curiam).

Following our remand, a divided court of appeals affirmed the trial court's judgment of dismissal for want of a timely filed expert report, concluding that Marks had asserted only health care liability claims. 229 S.W.3d at 402. One justice dissented in part, urging that Marks's fourth claim concerning the defective footboard was a premises liability claim rather than a health care liability claim under the MLIIA. *Id.* at 403 (Jennings, J., dissenting in part). We granted Marks's petition for review to consider the issue.

## II

Several of the allegations in Marks's trial court pleadings are similar to those in *Diversicare,* a case in which we concluded that a nursing-home patient's sexual assault by another patient was a health care liability claim under the MLIIA. *Diversicare,* 185 S.W.3d at 842. The allegations there were that the nursing home was negligent in failing to provide sufficient staff and supervision to prevent the assault. *Id.* at 845. The trial court held the claim barred by the MLIIA's two-year statute of limitations and granted summary judgment for the nursing home. *Id.* The court of appeals reversed, however, concluding the suit was not a statutory health care liability claim, but rather a common law negligence claim to which the MLIIA's limitations provision did not apply. *Rubio v. Diversicare Gen. Partner, Inc.,* 82 S.W.3d 778, 783–84 (Tex.App.-Corpus Christi 2002), *rev'd,* 185 S.W.3d 842 (Tex.2005). We disagreed, holding that the law suit was indeed a health care liability claim as determined by the trial court. *Diversicare,* 185 S.W.3d at 849.

We noted that nursing homes provide services to their residents that include supervision of daily activities, routine examinations, monitoring of the residents' physical and mental condition, administering medication, "and meeting the fundamental care needs of the residents." *Id.* We further noted that these services are provided by professional staff, and "[t]he level and types of health care services provided vary with the needs and capabilities, both physical and mental, of the patients." *Id.* at 849–50 (citing *Harris v. Harris County Hosp. Dist.,* 557 S.W.2d 353, 355 (Tex.Civ. App.-Houston [1st Dist.] 1977, no writ)). We then reasoned that those services, including the monitoring and protection of the patient, as well as training and staffing policies, were "integral components of Diversicare's rendition of health care services[.]" *Id.* at 850.

Marks's first three claims—failing to properly train and supervise its agents, employees, servants, and nursing staff when caring for him; failing to provide him with the assistance he required for daily living activities; and failing to provide him a safe environment in which to

receive treatment and recover—similarly involve patient supervision and staff training. As in *Diversicare*, this type of claim asserts a departure from the accepted standard of health care and is therefore a health care liability claim under the MLI-IA.

Marks argues that his hospital bed claim is different, however. He alleges that the hospital was negligent either in the assembly or maintenance of the bed, or both, and that the defectively attached footboard presented an unsafe condition in the nature of a premises liability claim rather than a health care liability claim. Marks submits that his defective bed claim involves ordinary negligence rather than a departure from accepted standards of health care or safety.

The hospital responds that Marks's hospital bed was an inextricable part of his care and treatment during his inpatient convalescence from back surgery. As such, the hospital submits that any defect in the bed, or any danger it posed to the patient, implicated a departure from accepted standards of health care or safety and was accordingly a health care liability claim under the MLIIA.

The MLIIA defines a "health care liability claim" as:

> a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care or health care or safety which proximately results in injury to or death of the patient, whether the patient's claim or cause of action sounds in tort or contract.

Tex.Rev.Civ. Stat. art. 4590i, § 1.03(a)(4). Under this definition, a health care liability claim consists of three elements. First, a physician or a health care provider must be the defendant. Second, the suit must be about the patient's treatment, lack of treatment, or some other departure from accepted standards of medical care or health care or safety. And, third, the defendant's act, omission, or other departure must proximately cause the patient's injury or death. The dispute here is over the second element, that is, whether the hospital's alleged failure to provide its patient a safe bed implicates certain accepted standards embodied in the definition of a health care liability claim.

The statute provides some information about these standards through its definitions of medical care and health care. The MLIIA defines "medical care" as the practice of medicine, including the diagnosis and treatment by a licensed physician, and "health care" as "any act or treatment performed or furnished, or which should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." *Id.* § 1.03(a)(2), (6). These definitions indicate then that physicians provide medical care, and that health care providers, which includes hospitals and their employees, provide other health care services. A "claimed departure from accepted standards of medical care or health care" thus implicates the professional standards of these respective care givers. *See Diversicare*, 185 S.W.3d at 850 (noting that the "health care standard applies the ordinary care of trained and experienced medical professionals to the treatment of patients").

The statute, however, does not define the term "safety" and thus does not provide similar insight into the meaning of a "claimed departure from accepted standards of ... safety." We noted this in *Diversicare*, while observing that the inclusion of accepted standards of safety nevertheless expanded the statute's scope beyond standards of medical care and health

care. *Diversicare*, 185 S.W.3d at 855. How much it expanded the statute's scope we did not say because the claim there involved a departure from accepted standards of health care more so than safety. *Id.* Marks's present claim, however, focuses on the safety element, that is, whether a patient injury caused by an allegedly defective hospital bed represents a "claimed departure from accepted standards of . . . safety" within the statute's definition of a "health care liability claim." *See* Tex.Rev.Civ. Stat. art. 4590i, § 1.03(a)(4) (defining health care liability claim).

## III

The nature of the safety-related claims the Legislature intended to include under the MLIIA is a matter of statutory construction, a legal question we review de novo. *City of Garland v. Dallas Morning News*, 22 S.W.3d 351, 357 (Tex.2000). When construing a statute, words and phrases are read in context and construed according to the rules of grammar and common usage. Tex. Gov't Code § 311.011(a). Words that are not defined are given their ordinary meaning unless a contrary intention is apparent from the context, or unless such a construction leads to absurd results. *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625–26 (Tex. 2008). When possible, the Legislature's intent is drawn from the plain meaning of the words chosen, *State v. Shumake*, 199 S.W.3d 279, 284 (Tex.2006), giving effect to all words so that none of the statute's language is treated as surplusage. *Cont'l Cas. Ins. Co. v. Functional Restoration Assocs.*, 19 S.W.3d 393, 402 (Tex.2000). Our ultimate goal, however, is to understand the Legislature's intent and apply that intent according to the statute's purpose. Tex. Gov't Code § 312.005; *see also City of LaPorte v. Barfield*, 898 S.W.2d 288, 292 (Tex.1995) (referring to legislative intent as the "polestar of statutory construction").

The Legislature's stated purpose in enacting article 4590i was to remedy "a medical malpractice insurance crisis" in Texas and its "material adverse effect on the delivery of medical and health care services in Texas[.]" Tex.Rev.Civ. Stat. art. 4590i, § 1.02(a)(5)-(6). This concern pervades the statute which is replete with references to medical liability, health care, and malpractice, all of which implicate medical or health care judgments made by professionals. *See, e.g., id.* § 13.01(r)(5)-(6) (requiring expert to have knowledge of medical diagnosis, care, and treatment); *see also Aviles v. Aguirre*, 292 S.W.3d 648, 649 (Tex.2009) (per curiam) (noting that virtually all of the legislative findings expressed in the statute relate to the cost of malpractice insurance). The MLIIA, however, defines a health care liability claim not only in terms of the specific standards of medical care and health care, but also in terms of an apparently more general standard of safety. *Id.* § 103(a)(4).

We do not consider the term "safety" in isolation, however, but in the context of the statute. *City of San Antonio v. Boerne*, 111 S.W.3d 22, 25 (Tex.2003). Moreover, the principle of ejusdem generis warns against expansive interpretations of broad language that immediately follows narrow and specific terms, and counsels us to construe the broad in light of the narrow. *See Hilco Elec. Coop. v. Midlothian Butane Gas Co.*, 111 S.W.3d 75, 81 (Tex.2003) (observing that when words of a general nature are used in connection with the designation of particular objects, persons, or things, the meaning of the general words should conform to the more particular designation). The principle is sound advice here as every patient injury in a hospital, regardless of cause, may be said to impli-

cate patient safety in the broad sense of the word.

The Legislature, however, could not have intended that standards of safety encompass all negligent injuries to patients. Such a broad interpretation of the safety standard would render the statute's more specific standards of medical and health care unnecessary, and we do "not read statutory language to be pointless if it is reasonably susceptible of another construction." *City of LaPorte*, 898 S.W.2d at 292 (citing *Chevron Corp. v. Redmon*, 745 S.W.2d 314, 316 (Tex.1987)). Moreover, given the object of the statute and the Legislature's express concern, it is apparent that the Legislature did not intend for standards of safety to extend to every negligent injury that might befall a patient. *See* TEX.REV.CIV. STAT. art. 4590i, § 1.02(b)(3) (reciting Legislature's intent that the statute operate to control medical malpractice insurance costs without unduly restricting a patient's rights). Applying the principle of ejusdem generis, we conclude that standards of safety must be construed in light of the other standards of medical and health care, standards that are directly related to the patient's care and treatment. We said as much in *Diversicare*.

We noted there that not every accidental injury to a patient in a health care setting would constitute a health care liability claim under article 4590i. *Diversicare*, 185 S.W.3d at 854 (suggesting that unsafe conditions unrelated to the provision of health care might not be a health care liability claim). We further observed that standards of medical care or health care were implicated when the negligent act or omission was an inseparable or integral part of the rendition of medical services. *Diversicare*, 185 S.W.3d at 848–49. Similarly, an accepted standard of safety is implicated under the MLIIA when the unsafe condi-

tion or thing, causing injury to the patient, is an inseparable or integral part of the patient's care or treatment.

The determination of whether a cause of action is a health care liability claim therefore requires an examination of the claim's underlying nature. *Garland Cmty. Hosp. v. Rose*, 156 S.W.3d 541, 543 (Tex.2004). As we indicated in *Diversicare*, it is the gravamen of the claim, not the form of the pleadings, that controls this determination. *See Diversicare*, 185 S.W.3d at 854. Whether the underlying claim involves a health care provider's negligent act or omission, or the patient's exposure to some other safety risk, the relationship between the injury causing event and the patient's care or treatment must be substantial and direct for the cause of action to be a health care liability claim under the MLIIA. *See Garland Cmty. Hosp.*, 156 S.W.3d at 544 (observing the complaint must concern an act or omission that "is an inseparable part of the rendition of health care services").

Marks alleges that his injury here was caused by the hospital's improper maintenance or assembly of his hospital bed. At its core, this claim alleges the failure of a piece of equipment provided during Marks's inpatient care. Medical equipment specific to a particular patient's care or treatment is an integral and inseparable part of the health care services provided. When the unsafe or defective condition of that equipment injures the patient, the gravamen of the resulting cause of action is a health care liability claim.

## IV

■ Although we conclude that Marks's claims here involve health care liability, a question remains concerning their dismissal. Marks argues that his complaint should not have been dismissed because he was entitled to additional time to provide an expert report. Article 4590i generally

requires a claimant to furnish an expert report within 180 days after the filing of a health care liability claim. Tex.Rev.Civ. Stat. art. 4590i, § 13.01(d). If a claimant fails to comply with this requirement, the court is directed, on motion, to award appropriate costs and fees and to dismiss the health care liability claim with prejudice. *Id.* § 13.01(e). The 180–day period can be extended, however, for good cause and enlarged for accidents and mistakes. *Id.* § 13.01(f), (g). The latter enlargement is referenced in the statute as a grace period.

■ Marks contends that he was entitled to this grace period because his failure to file the expert report on time was an accident or mistake within section 13.01(g)'s meaning. That section provides for a thirty day grace period if, after a hearing, the court finds that the claimant's failure to file a timely expert report was a mistake or accident rather than intentional or the result of conscious indifference.[3] After hearing the Hospital's motion to dismiss and Marks's motion for a grace period, the trial court found that Marks's failure was not an accident or mistake and dismissed the suit. We review that dismissal under an abuse of discretion standard. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 875 (Tex.2001).

In support of Marks's motion for grace period, Marks's attorney, James E. Doyle, provided his affidavit. Doyle averred that he was Marks's second attorney, becoming lead counsel about seven months after the first attorney filed the case. Doyle further averred that he and Marks's first attorney "understood the case to be an ordinary negligence case, not a health care liability claim" at that time. According to Doyle's affidavit, it was only after discovery that he determined that Marks also had a potential health care liability claim, causing him to amend the pleadings and provide an expert report. This report was provided more than 500 days after the filing of Marks's original petition.

The amended petition divided Marks's claims under headings of "Negligence" and "Premises Liability." The original petition had lumped all claims under a single "Negligence" heading. In the amended pleading, Marks included complaints about his bed, his care, and his supervision under the "Negligence" heading. Under the "Premises Liability" heading, Marks complained about the condition of the hospital bed. Doyle avers that up until the time he filed the amended pleading, he "believed that the case presented claims sounding only in ordinary negligence."

■ In our view, there is no significant difference between the original and the amended pleading. The underlying factual complaint in both concern the same set of circumstances: inadequate care and supervision by the Hospital's professional staff and a dangerous hospital bed. "It is well settled that a health care liability claim cannot be recast as another cause of action to avoid the requirements of [article 4590i]." *Diversicare,* 185 S.W.3d at 851. Determining whether a pleading states a

---

3. Section 13.01(g) of article 4590i provides:
Notwithstanding any other provision of this section, if a claimant has failed to comply with a deadline [for filing the expert report] established by Subsection (d) of this section and after hearing the court finds that the failure of the claimant or the claimant's attorney was not intentional or the result of conscious indifference but was the result of an accident or mistake, the court shall grant a grace period of 30 days to permit the claimant to comply with that subsection. A motion by a claimant for relief under this subsection shall be considered timely if it is filed before any hearing on a motion by a defendant under Subsection (e) of this section.

health care liability claim thus depends on its underlying substance, not its form. It is not apparent from Doyle's affidavit what caused him to recognize for the first time that his client had a health care liability claim.

▮ Equally significant, however, is the absence of any evidence explaining the first attorney's failure to furnish an expert report during the first seven months he represented Marks. Doyle's affidavit suggests that the first attorney also mistakenly believed that the original petition did not implicate article 4590i. According to the affidavit, Doyle's belief is based on his review of the case file he inherited. Affidavits, however, must be based on personal knowledge, not supposition. *See* TEX.R. EVID. 602 ("A witness may not testify to a matter unless . . . the witness has personal knowledge of the matter."). An affidavit not based on personal knowledge is legally insufficient. *Kerlin v. Arias,* 274 S.W.3d 666, 668 (Tex.2008) (per curiam). Because Doyle had no personal knowledge of the first lawyer's intent, and the first lawyer did not provide his own affidavit explaining his failure, there is no evidence of mistake or accident and thus no basis for the requested grace period. Accordingly, the trial court did not abuse its discretion in denying Marks's motion for grace period under section 13.01(g) and did not err in dismissing Mark's health care liability claims. *See* TEX.REV.CIV. STAT. art. 4590i, § 13.01(e)(3) (dismissal is "with prejudice to the claims refiling").

\*　　\*　　\*

▮ Because the provision of a safe hospital bed was an inseparable part of the health care services provided during Marks's convalescence from back surgery, we conclude that his cause of action for injuries allegedly caused by the unsafe bed is a health care liability claim under article 4590i. We further agree that the trial court did not abuse its discretion in refusing Marks's request for additional time to file the requisite expert report and accordingly affirm the court of appeals' judgment.

Justice WAINWRIGHT filed a concurring opinion.

Justice JOHNSON filed a concurring opinion, in which Justice WILLETT joined, and in which Justice HECHT joined as to Parts II and III–A, and in which Justice WAINWRIGHT joined as to Parts I, II, and III–A.

Chief Justice JEFFERSON filed an opinion concurring in part and dissenting in part, in which Justice GREEN, Justice GUZMAN, and Justice LEHRMANN joined.

Justice GUZMAN filed an opinion concurring in part and dissenting in part.

Justice WAINWRIGHT, concurring.

I agree with the plurality's opinion to the extent it concludes that a claim for injury arising from the alleged improper operation of a hospital bed provided for the care and recuperation of a back-surgery patient is a health care liability claim. Marks acknowledged this in his filings at the trial court, and the trial judge properly held that his claim was governed by the Medical Liability and Insurance Improve Act (MLIIA).[1] *See* TEX.REV.CIV. STAT. art. 4590i.[2] I therefore join parts I and IV of

---

1. Marks's retained physician concluded in his expert report that St. Luke's Episcopal Hospital violated "accepted standards of good nursing care" specifically by failing "to ensure

that the footboard was properly secured to the bed."

2. Medical Liability and Insurance Improvement Act of Texas, Act of May 30, 1977, 65th

the plurality's opinion and the Court's judgment. I agree with JUSTICE JOHNSON's concurring opinion addressing the "health care" prong of health care liability claims and our precedents, holding that "splicing health care liability claims into a multitude of other causes of action with standards of care, damages, and procedures contrary to the Legislature's explicit requirements" is not permitted. *See Diversicare Gen. Partner, Inc. v. Rubio,* 185 S.W.3d 842, 854 (Tex.2005); *see also, e.g., Garland Cmty. Hosp. v. Rose,* 156 S.W.3d 541, 543, 545 (Tex.2004). I therefore join parts I, II, and III.A of JUSTICE JOHNSON's concurring opinion. I do not join part III of the plurality's opinion, part III.B of JUSTICE JOHNSON's concurring opinion or address the dissenters' arguments concerning the "safety" prong of health care liability claims [3] because it is not necessary in this case, as it was not in *Diversicare,* to define the precise scope of "safety" under the MLIIA. *See Diversicare,* 185 S.W.3d at 854–55 (explaining in part III.B.2 of the opinion that an injury to a patient from a rickety staircase or an unlocked window does not implicate the "health care" prong of health care liability claims).

Justice JOHNSON, joined by Justice WILLETT, and by Justice HECHT as to Parts II and III–A, and by Justice WAINWRIGHT as to Parts I, II, and III–A, concurring.

I fully join parts I and IV of the plurality's opinion and the Court's judgment. I agree with parts II and III of the opinion to the extent the plurality concludes Marks's claim is a health care liability claim because it alleges violations of ac-
cepted standards of health care and accepted standards of safety. However, I believe that the plurality too narrowly construes the language "accepted standards of . . . safety." I also believe that Marks's suit should be dismissed for reasons in addition to, and in some instances different from, those given by the plurality.

First, Marks's claim is based on a single incident and is substantively a health care liability claim in its entirety. This Court has consistently maintained that health care liability claims cannot be split into health care and non-health care claims by artful pleading. The claim for negligently assembling, maintaining, and providing the bed should be dismissed along with Marks's other allegations that unquestionably assert health care liability claims.

Second, the claim for improper assembling, maintaining, and providing the bed is a claim for violating accepted standards of health care regardless of whether those actions also violated safety standards.

Third, the claim for improper assembling, maintaining, and providing the bed is a claim for violating accepted standards of safety regardless of whether the actions also violated accepted health care standards. The plurality reads the statute too narrowly and thus reduces the scope of actions covered by the term "safety" from that prescribed by the statute.

### I.  Background

Marks underwent surgery at St. Luke's Hospital to implant a morphine pump into his spinal cord after multiple previous surgeries failed to alleviate his back problems.

Leg., R.S., ch. 817, 1977 Tex. Gen. Laws 2039, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884. The successor statute is applicable to actions filed on or after September 1, 2003. TEX. CIV. PRAC. & REM. CODE ch. 74.

3. *See United States v. Travers,* 514 F.2d 1171, 1174 (2d Cir.1974) (Friendly, J.) ("Cassandra-like predictions in dissent are not a sure guide to the breadth of the majority's ruling. . . .").

**668**

After surgery, the nursing staff made a notation in his medical records that he was at risk of falling because of his limited mobility, of his need for an ambulatory assistance device, the fact he was on morphine, and "Safety/Fall Precautions" were being implemented. The hospital's Safety/Fall Precautions included provisions that there should be "no environmental hazards" in Marks's room, his hospital bed was to be "in a low position with the brakes applied," and the "side rails and safety devices" should be used as indicated. Marks alleges that eight days after his surgery and while still an inpatient, he and the footboard on his hospital bed fell when he placed his hand on the footboard and attempted to push himself from the bed to a standing position.

Marks sued St. Luke's. He alleged the hospital was negligent in the following respects: (1) failing to properly train and supervise hospital employees in how to prevent falls and injuries; (2) failing to provide Marks with the assistance he required for daily living activities; (3) failing to provide him with a safe environment in which to receive treatment and recover; and (4) providing him with a hospital bed that had been negligently assembled and maintained by the hospital's employees or nursing staff.

Marks failed to timely file an expert report and the trial court dismissed his suit. The court of appeals affirmed. 229 S.W.3d 396. One justice dissented on the basis that the claim for negligently assembling, maintaining, and providing the bed was not a health care liability claim. *Id.* at 403 (Jennings, J., dissenting in part).

## II. Artful Pleading

This Court, as did the trial court and the court of appeals, concludes that Marks's first three allegations of negligence are health care liability claims under the Medical Liability and Insurance Improvement Act (MLIIA). *See* former TEX.REV.CIV. STAT. art. 4590i, § 1.03(a)(4).[1] That conclusion requires dismissal of Marks's suit entirely because the fourth allegation—that the bed was negligently assembled, maintained, and provided—is based on the same facts and the same damages as the first three. The Court has previously held that when a cause of action is essentially a health care liability claim and a timely expert report has not been served, the claim should be dismissed in its entirety regardless of how the claim is pled. That should occur here.

In *Diversicare General Partner, Inc. v. Rubio* the concurring and dissenting justices concluded that the victim of a sexual assault at a nursing home asserted a premises liability claim against the nursing home independent of her health care liability claim. 185 S.W.3d 842, 857–58 (Tex. 2005) (Jefferson, C.J., concurring in part and dissenting in part); *id.* at 861–66 (O'Neill, J., dissenting). The Court rejected that view because it "would open the door to splicing health care liability claims into a multitude of other causes of action with standards of care, damages, and procedures contrary to the Legislature's explicit requirements. It is well settled that such artful pleading and recasting of claims is not permitted." *Id.* at 854; *see*

---

1. Medical Liability and Insurance Improvement Act of Texas, 65th Leg., R.S., ch. 817, § 1.03, 1977 Tex. Gen. Laws 2039, 2041, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884. While this case was pending, the Legislature repealed the MLIIA, amended parts of the previous article 4590i, and re-codified it in 2003 as chapter 74 of the Texas Civil Practice and Remedies Code. Because article 4590i continues to govern this case, citations are to the former article rather than the Civil Practice and Remedies Code.

*also Murphy v. Russell,* 167 S.W.3d 835, 838 (Tex.2005) ("[A] claimant cannot escape the Legislature's statutory scheme by artful pleading."); *Garland Cmty. Hosp. v. Rose,* 156 S.W.3d 541, 543 (Tex.2004) ("Plaintiffs cannot use artful pleading to avoid the MLIIA's requirements when the essence of the suit is a health care liability claim."). I would adhere to the Court's holding and reaffirm the language the Court used in *Diversicare* and other cases rejecting claim-splitting by pleadings. Otherwise, the door will be opened to manipulated, inventive, and artful pleadings designed to avoid the MLIIA requirements and limitations.

By failing to address the claim-splitting aspect of this situation, the plurality's opinion may create uncertainty in the bench and bar as to whether claim-splitting is permissible. And such uncertainty almost assuredly will lead to more extended and expensive trial and appellate court proceedings to determine whether a patient's pleadings assert health care liability claims, non-health care liability claims, or both; and if both, which is which. Extended proceedings and associated increased costs, including economic settlements to avoid litigation expense, are a significant part of what the Legislature intended to avoid through enactment of the MLIIA. *See* TEX.REV.CIV. STAT. art. 4590i, § 1.02(b)(2);[2] *see also id.* § 1.02(b)(1).

The Court should make clear it is not abandoning its position that when the substance of a patient's claim for damages comes within the statutory definition of a health care liability claim, then the MLIIA applies to all the plaintiff's claims against the health care provider based on that injury. Here, no matter how Marks pleaded his case, the substantive facts are that his injury arises from a health care liability claim and he should not be allowed to avoid application of the MLIIA by finding another way to plead his claim for damages.

### III. Health Care and Safety

The hospital bed furnished to Marks was an integral and inseparable part of the health care he received from St. Luke's. St. Luke's asserts that Marks's suit implicates accepted standards of both health care and safety as referenced by the MLIIA. I agree.

In determining whether the MLIIA encompasses Marks's claims, we use well-established statutory construction rules. Courts should ascertain and give effect to the Legislature's intent as expressed by the language of the statute. *E.g., Entergy Gulf States, Inc. v. Summers,* 282 S.W.3d 433, 437 (Tex.2009); *State v. Shumake,* 199 S.W.3d 279, 284 (Tex.2006) ("[W]hen possible, we discern [legislative intent] from the plain meaning of the words chosen."). The prime principle is "the words [the Legislature] chooses should be the surest guide to legislative intent." *See Fitzgerald v. Advanced Spine Fixation Sys., Inc.,* 996 S.W.2d 864, 866 (Tex.1999). Only when those words are ambiguous do we "resort to rules of construction or extrinsic aids." *In re Estate of Nash,* 220 S.W.3d 914, 917 (Tex.2007). We use definitions prescribed by the Legislature and any technical or particular meaning the words have acquired, but otherwise we construe the statute's words according to their plain and common meaning unless a contrary intention is apparent from the context or unless such a construction leads to nonsensical or absurd results. *FKM P'ship, Ltd. v. Bd.*

---

**2.** Medical Liability and Insurance Improvement Act of Texas, 65th Leg., R.S., ch. 817, § 1.02, 1977 Tex. Gen. Laws 2039, 2040, *re-* *pealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884.

*of Regents of Univ. of Houston Sys.*, 255 S.W.3d 619, 633 (Tex.2008); *see also Fleming Foods of Tex., Inc. v. Rylander*, 6 S.W.3d 278, 284 (Tex.1999).

## A. Health Care

The MLIIA defines a health care liability claim as:

> a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care or health care or safety which proximately results in injury to or death of the patient, whether the patient's claims or cause of action sounds in tort or contract.

Tex.Rev.Civ. Stat. art. 4590i, § 1.03(a)(4). As the plurality notes, a cause of action is a health care liability claim if it (1) is against a health care provider or physician; (2) for treatment, lack of treatment, or other claimed departure from accepted standards of medical care or health care or safety; and (3) the alleged departure from accepted standards proximately results in injury to or death of the patient. The Act broadly defines "health care" as:

> *any* act ... which should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement.

Tex.Rev.Civ. Stat. art. 4590i, § 1.03(a)(2) (emphasis added); *see Diversicare*, 185 S.W.3d at 847 (describing health care as "broadly defined" under the MLIIA). Applying this broad definition, the Court has previously concluded that "[a] cause of action alleges a departure from accepted standards of ... health care if the act or omission complained of is an inseparable part of the rendition of health care services." *Diversicare*, 185 S.W.3d at 848; *see Walden v. Jeffery*, 907 S.W.2d 446, 448 (Tex.1995). In this case, no one disputes that Marks's hospital confinement while recovering from the latest of several back surgeries was medically necessary. If his condition made hospitalization medically necessary, then it logically follows that the hospital had to provide him with a hospital bed. And, if a hospital bed was necessary for Marks's care and recuperation, it follows that the bed was an integral and inseparable part of his care and treatment. *See Diversicare*, 185 S.W.3d at 849–54.

Marks focuses on the assembling and maintaining of the bed, as opposed to its use in patient care. He argues that his claim for negligent assembly and maintenance is not a health care liability claim because it is based on the breach of an ordinary standard of care, not on a discrete standard of care applicable to the health care industry. His position, as to the bed claim, is that St. Luke's owed him the general duty of care owed by businesses to their invitees.[3]

Although health care providers and patients may well be premises owners or occupiers and invitees, the Legislature has imposed requirements on suits by patients against health care providers that differ from general requirements for suits by invitees against premises owners or occupiers. *See* Tex.Rev.Civ. Stat. art. 4590i, § 1.03(a)(3); *Diversicare*, 185 S.W.3d at 850 ("The obligation of a health care facility to its patients is not the same as the general duty a premises owner owes to invitees."). If Marks had been a guest in a

---

3. As the Court did in *Diversicare*, I "note the irony" of this position. *Diversicare*, 185 S.W.3d at 853. Marks asserts that the MLIIA should not apply to his claim because the claim is a premises liability claim based on ordinary negligence. But his position, if adopted, would have the effect of lowering the standard of care owed by health care providers to patients in health care facilities. *See id.* at 853–54.

hotel when his bed fell, his fall could well have given rise to a premises liability claim. But he was not a hotel guest; he was a patient receiving health care in a hospital. There is a difference because of the MLIIA. *Diversicare,* 185 S.W.3d at 850 ("There is an important distinction in the relationship between premises owners and invitees on one hand and health care facilities and their patients on the other. The latter involves health care.").

Marks's own expert reports affirm that the hospital's provision of the hospital bed was an integral and inseparable part of actions that were "furnished, or which should have been performed or furnished, by [St. Luke's] for, to, or on behalf of [Marks] during [Marks's] medical care, treatment, or confinement." *See* Tex.Rev. Civ. Stat. art. 4590i, § 1.03(a)(2). Although the reports were served too late to save his health care claims from dismissal, they demonstrate what Marks contends is the proper standard of care. Dr. Jeffrey D. Reuben opined:

> The accepted standard of care for nursing and hospital practice is to provide the patient with reasonably safe medical equipment, including a hospital bed for inpatients, to receive and recover from medical treatment. The accepted standard of good care for nursing and hospital practice is to evaluate each patient to determine if he/she is a risk to fall.... If a ... patient may be a risk to fall, the accepted standard of good care for nursing and hospital practice is to implement interventions to eliminate and reduce the patient's risk of falling....
>
> ... [St. Luke's] knows that patients would use the footboard on a hospital bed as support to get out of bed. It is for this reason that the hospital footboard should be firmly secured to the hospital bed. [St. Luke's] staff violated the accepted standard of care by failing

to provide [Marks] with a [footboard] that was properly secured to the hospital bed.... Given [St. Luke's] staff's knowledge that [Marks] was a risk to fall, that he was on morphine, and that its patients use the footboard as support to get out of the hospital bed, [St. Luke's] nursing staff should have provided [Marks] with a footboard that was properly secured to the hospital bed, and as part of its ongoing duty to assess and identify potential fall hazards, should have identified and properly secured the footboard to the hospital bed.

Nurse practitioner Jan Zdanuk's opinion was similar:

> Hospitals have a duty to provide a safe environment of care for all patients. This includes equipment such as hospital beds that must be maintained in safe operating condition at all times. It is a breach in the standard of care for a footboard to fall off a bed when a patient leans on it while attempting to get up resulting in a fall with serious injuries.

The Legislature has prescribed, and the expert reports filed in this case recognize, that disputes such as the one before us involve standards of care owed by hospitals to patients.

To the extent the plurality says or implies that a claim for a departure from accepted health care standards depends on allegations concerning acts or omissions of hospital workers with specialized health care training—as opposed to hospital workers without specialized training who are nevertheless necessary for a hospital to properly care for patients—I disagree. Marks's Original Petition states the hospital bed was negligently assembled by St. Luke's "employees, agents, servants or nursing staff." The MLIIA does not limit "health care" to those actions taken by nurses or doctors. Rather, the legislative definition of health care includes "any act"

which was or should have been performed or furnished "by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." Tex.Rev.Civ. Stat. art. 4590i, § 1.03(a)(2). The Act defines "health care provider" as

> any person, partnership, professional association, corporation, facility, or institution duly licensed or chartered by the State of Texas to provide health care as a registered nurse, hospital, dentist, podiatrist, pharmacist, or nursing home, *or an officer, employee, or agent thereof* acting in the course and scope of his employment.

*Id.* § 1.03(a)(3) (emphasis added). The definition plainly includes, without qualification, employees of health care providers so long as they are acting in the course and scope of their employment.

There is no need to dissect and inquire into or distinguish between categories of health-care-provider employees based on duties, types of actions performed, and the type of judgment exercised. The literal and plain statutory language includes all officers, employees, or agents of the provider acting in the course and scope of their employment. *Id.* Giving the language its literal meaning does not yield absurd or nonsensical results. *See, e.g., In re Jorden,* 249 S.W.3d 416, 423 n. 32 (Tex. 2008) ("There are instances where the literal meaning of a statute may be disregarded. But it is only where it is perfectly plain that the literal sense works an absurdity or manifest injustice." (quoting *Gilmore v. Waples,* 108 Tex. 167, 188 S.W. 1037, 1039 (1916))). Marks's claim as to the hospital bed is a claim that the hospital violated accepted standards of health care.

### B. Safety

I agree with parts II and III of the plurality's opinion to the extent those parts

conclude that providing a reasonably safe hospital bed to Marks involved accepted standards of safety. However, I believe the plurality construes the "accepted ... standards of safety" language too narrowly.

The MLIIA defines a health care liability claim to include "a cause of action against a health care provider or physician for ... [a] claimed departure from accepted standards of ... safety which proximately results in injury to or death of the patient." Tex.Rev.Civ. Stat. art. 4590i, § 1.03(a)(4). The plurality says that under the statute

> standards of safety must be construed in light of the other standards of medical and health care, standards that are directly related to the patient's care and treatment.... [A]n accepted standard of safety is implicated under the MLIIA when the unsafe condition or thing, causing injury to the patient, is an inseparable or integral part of the patient's care or treatment.

319 S.W.3d at 664. The statute does not so limit its provision as to safety standards. The plurality's construction constricts the application of the statute by effectively adding language to it.

Although the MLIIA does not define "safety," the statute specifies that legal terms or words of art used but not otherwise defined in the statute "shall have such meaning as is consistent with the common law." Tex.Rev.Civ. Stat. art. 4590i, § 1.03(b). Thus, in interpreting the MLIIA, the Court has previously construed "safety" according to its common law definition as the condition of being "untouched by danger; not exposed to danger; secure from danger, harm or loss." *Diversicare,* 185 S.W.3d at 855 (quoting Black's Law Dictionary 1336 (6th ed.1990)).

The Court's prior broad construction of the safety standard is consistent with the plain language of the statute, does not offend the purpose of the statute, is not inconsistent with its contextual meaning, and does not yield an absurd or nonsensical result. *See id.* at 847 (describing health care as "broadly defined" under the MLIIA). I agree with Chief Justice Jefferson's choice of words in *Diversicare*:

> Because the statute does not define "safety," we must assign its common meaning ... [of] protection from danger.... The specific source of that danger, be it a structural defect, criminal assault, or careless act, is without limitation. While it may be logical to read into the statute a requirement that a safety related claim also involve health care, there is nothing implicit in safety's plain meaning nor explicit in the MLIIA's language that allows us to impose such a restriction.

*See id.* at 860–61 (Jefferson, C.J., concurring in part, and dissenting in part) (citations omitted). Statements the plurality makes today depart from the Court's prior reading of the statute, and I would not do so. The MLIIA reflects legislative intent to broadly, not narrowly, cover claims made by patients against their health care providers. If policy considerations support limiting or excluding subcategories of claims when the unambiguous statutory language includes the overall category, as it does here, then incorporating those exclusions into the statute is a Legislative prerogative, not a judicial one. *See* TEX. CONST. art. II, § 1; *Lee v. City of Houston,* 807 S.W.2d 290, 294–95 (Tex.1991) ("A court may not judicially amend a statute and add words that are not implicitly contained in the language of the statute."); *Smith v. Davis,* 426 S.W.2d 827, 831 (Tex. 1968).

If a health care provider furnishes unsafe materials or creates an unsafe condition as an integral and inseparable part of a patient's health care or treatment, the health care provider's acts or omissions would already fall within the category of claims based on departures from accepted standards of health care and there would be no need for the Act to include the word "safety." *See Diversicare,* 185 S.W.3d at 848 ("A cause of action alleges a departure from accepted standards of medical care or health care if the act or omission complained of is an inseparable part of the rendition of medical services."). Applying the plurality's "inseparable or integral part of the patient's care or treatment" standard to "safety" effectively reads safety out of the statute instead of properly giving it meaning as an additional category of claims. *See id.* at 855 ("Certainly, the Legislature's inclusion within the scope of the MLIIA of claims based on breaches of accepted standards of 'safety' expands the scope of the statute beyond what it would be if it only covered medical and health care."). This Court has consistently construed statutes based on the presumption that the Legislature intended an entire statute to be effective, so we "try to give effect to all the words of a statute, treating none of its language as surplusage when reasonably possible." *Phillips v. Bramlett,* 288 S.W.3d 876, 880 (Tex.2009); *e.g.,* TEX. GOV'T CODE § 311.021(2); *Sultan v. Mathew,* 178 S.W.3d 747, 751 (Tex.2005) ("We must avoid, when possible, treating statutory language as surplusage."); *City of LaPorte v. Barfield,* 898 S.W.2d 288, 292 (Tex.1995) ("We will not read statutory language to be pointless if it is reasonably susceptible of another construction."); *Perkins v. State,* 367 S.W.2d 140, 146 (Tex. 1963) ("[E]ach sentence, clause and word is to be given effect if reasonable and possible."). Accordingly, the Court should construe the Legislature's inclusion of

"safety" claims in the MLIIA as expanding the scope of health care liability claims beyond what it would be if the statute only covered medical and health care claims, not confining those claims to be the same as claims already coming within the statute's coverage as health care claims. *Diversicare*, 185 S.W.3d at 855.

## IV. Conclusion

I agree that Marks's suit should be dismissed in its entirety. However, I would hold that the entire suit, including the allegations concerning the hospital bed, falls within the MLIIA and is barred for three reasons: (1) the suit is substantively a health care liability claim and part of it cannot be recast into a non-health care claim; (2) the claims are for departures from accepted standards of health care; and (3) the claims are for departures from accepted standards of safety.

Chief Justice JEFFERSON, joined by Justice GREEN, Justice GUZMAN, and Justice LEHRMANN, concurring and dissenting.

Irving Marks was a patient at St. Luke's Hospital, where he was recovering from back surgery. In the middle of the night, Marks attempted to get out of bed. He leaned on the bed's footboard, which came loose and collapsed beneath him, causing him to fall. The Court held in 2009 that Marks's lawsuit to recover for his resulting injuries targeted the negligent assembly and maintenance of the footboard—a premises liability claim. *Marks v. St. Luke's Episcopal Hosp.*, 52 Tex. Sup.Ct. J. 1184, 1185 (Aug. 28, 2009). The Court reasoned that the "safety" prong of the Medical Liability and Insurance Improvement Act (MLIIA)[1] is implicated only if

the source of the negligence is directly related to medical or health care services involving health care professionals and the exercise of medical or professional judgment. *Id.* at 1186–87. According to the Court, the alleged negligent assembly and maintenance of the bed's footboard was unrelated to professional judgment and was merely incidental to Marks's care. *Id.* at 1189. Because the case involved "ordinary negligence" that did not require for its resolution "the specialized knowledge of a medical expert," the Court rejected the hospital's contention that Marks's allegation was a health care liability claim. *Id.*

The Court changes course today. A plurality repeats our earlier holding that the safety prong is implicated only if the underlying claim directly relates to a patient's care and treatment. Now, however, the Court concludes that the hospital bed is an inseparable part of the treatment Marks received. But the footboard relates to a patient's health care in the same way that the stairs, walls, and utilities do: without access to the room, shelter from the elements, power to adjust the room's temperature and to run medical equipment, doctors would be unable to deliver medical services. Examples like these would easily fit within the definition of a health care liability claim, because they involve claimed departures from accepted standards of safety. The Court has rejected that view, however. In a prior case, I wrote that the Legislature's definition of "safety" forbids a premises liability claim against a health care provider, even if the claim is based on a "structural defect, criminal assault, or careless act." *Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 861 (Tex.2005) (Jefferson, C.J., concurring and dissenting). Had the

1. *See* Medical Liability and Insurance Improvement Act of Texas, Act of May 30, 1977, 65th Leg., R.S., ch. 817, 1977 Tex. Gen. Laws 2039, 2041, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884.

*Diversicare* Court adopted that approach, the outcome of this case would not be in doubt. But the Court disagreed. It said that a patient may sue if a staircase gives way under her weight—a circumstance that would "give rise to [a] premises liability claim[ ]." *Id.* at 854. The Court held that the touchstone for distinguishing between a premises and a health care claim is that the latter involves an act or omission that is "inseparable from the provision of healthcare." *Id.*

Consistency in the law is difficult to achieve, of course, but we should strive to explain any discord our opinions generate. *Diversicare* holds that premises liability claims are viable against health care providers. *Id.* at 855. If that is so, then the Court must explain how a piece of wood at the end of a bed is integral to medical care. The Court's previous opinion describes in great detail why the footboard was *not* integral to St. Luke's delivery of health care services to Marks, and I have attached it as an appendix.

Marks's complaint about how the footboard was maintained has nothing to do with the scope or degree of medical services he received, nor does it involve professional medical judgment about how the bed's configuration might aid in his treatment. The footboard could as easily have been a chair in his room or a bedside table. If Marks leaned on his bedside table as support and it collapsed, would that be a health care liability claim? What if Marks fell down a "rickety staircase" while perambulating for the first time after surgery? The Court offers no explanation as to how the bed's footboard differs from the "rickety staircase" described in *Diversicare. See id.* at 854.

The Court can approach this conundrum in one of two ways. The Court can either say that:

Because the statute does not define "safety," we must assign it its common meaning. Safety is commonly understood to mean protection from danger. The specific source of that danger, be it a structural defect, criminal assault, or careless act, *is without limitation.* While it may be logical to read into the statute a requirement that a safety related claim also involve health care, there is nothing implicit in safety's plain meaning nor explicit in the MLIIA's language that allows us to impose such a restriction.

*Id.* at 860–61 (Jefferson, C.J., concurring and dissenting) (emphasis added) (citations omitted). Had that view prevailed, we would no longer discuss these types of claims in terms of "premises liability."

But the *Diversicare* Court rejected that approach, holding that health care liability claims must "implicate more than inadequate security or negligent maintenance." *Id.* at 854. It said that circumstances may "give rise to premises liability claims in a healthcare setting that may not be properly classified as healthcare liability claims." *Id.* at 854. We applied that conclusion in our first opinion in this case, stating that "when a piece of hospital equipment is unrelated to any professional judgment and is merely incidental to the patient's care, its alleged unsafe condition does not implicate article 4590i." *Marks,* 52 Tex. Sup.Ct. J. at 1189. The Court identified "several overlapping factors" to guide our determination, including whether the specialized knowledge of a medical expert may be necessary to prove the claim, whether a specialized health care standard applied, and whether the negligent act involved medical judgment related to the patient's care or treatment. *Id.* at 1189.

Nothing in the record or in the Court's new opinion establishes that a doctor's specialized knowledge is relevant here, nor

that a the footboard was an integral component of Marks's treatment. Because I do not believe that the bed's footboard was integral to or inseparable from the health care services St. Luke's provided to Marks, I respectfully dissent from the Court's judgment affirming the court of appeals' judgment on this ground.[2] I would affirm in part and reverse in part the court of appeals' judgment and remand the case to the trial court for further proceedings.

## APPENDIX

## IN THE SUPREME COURT OF TEXAS

No. 07–0783

IRVING W. MARKS, PETITIONER,

v.

ST. LUKE'S EPISCOPAL HOSPITAL, RESPONDENT

ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE FIRST DISTRICT OF TEXAS

**Argued September 11, 2008**

JUSTICE MEDINA delivered the opinion of the Court, in which CHIEF JUSTICE JEFFERSON, JUSTICE O'NEILL, JUSTICE BRISTER, and JUSTICE GREEN joined.

CHIEF JUSTICE JEFFERSON filed a concurring opinion.

JUSTICE HECHT filed a dissenting opinion.

JUSTICE WAINWRIGHT filed a dissenting opinion.

**2.** I agree with the Court (as I did previously) that Marks's first three claims (involving negligent supervision, failing to provide Marks with the assistance he needed, and failure to provide a safe environment in which to receive treatment and recover) are health care liability claims and that the trial court did not abuse its discretion in denying Marks a grace period or in dismissing those claims.

JUSTICE JOHNSON filed a dissenting opinion, in which JUSTICE HECHT, JUSTICE WAINWRIGHT, and JUSTICE WILLETT joined.

In this case we must decide whether a hospital patient's fall, allegedly caused by a negligently maintained hospital bed, is a health care liability claim under article 4590i of the Revised Civil Statutes.[3] Article 4590i, also known as the Medical Liability and Insurance Improvement Act, provides that health care liability claims, not accompanied by an expert report, may be dismissed with prejudice 180 days after filing, although a grace period is available under limited circumstances. The trial court concluded that the hospital bed claim here was a health care liability claim, which it then dismissed because of the patient's failure to file a timely expert report. The trial court also denied the patient's request for a grace period. The court of appeals initially disagreed with the trial court, concluding that the patient's claim was not a health care liability claim. *See Marks v. St. Luke's Episcopal Hosp.*, 177 S.W.3d 255, 260 (Tex.App.-Houston [1st Dist.] 2005), *vacated*, 193 S.W.3d 575 (Tex.2006). Following our remand of the case, however, the court affirmed the trial court's judgment. 229 S.W.3d 396. One justice dissented, arguing that the hospital bed claim was in the nature of a premises liability claim rather than a health care liability claim. *Id.* at 403 (Jennings, J., dissenting in part). We agree with the dissenting justice and accordingly reverse the court of appeals'

**3.** *See* Medical Liability and Insurance Improvement Act of Texas, Act of May 30, 1977, 65th Leg., R.S., ch. 817, 1977 Tex. Gen. Laws 2039, 2041, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884.

judgment and remand the case to the trial court.

## I

Irving Marks fell and injured himself during his recuperation from back surgery at St. Luke's Hospital. The fall occurred when Marks, while sitting on his hospital bed, attempted to use the bed's footboard to push himself up to a standing position. Unfortunately, the footboard came loose, causing Marks to fall. Marks sued the Hospital, alleging several acts of negligence, including: (1) failing to train and supervise the nursing staff properly, (2) failing to provide him with the assistance he required for daily living activities, (3) failing to provide him with a safe environment in which to recover, and (4) providing a hospital bed that had been negligently assembled and maintained by the hospital's employees.

The trial court concluded that Marks's petition asserted health care liability claims as defined under the Medical Liability and Insurance Improvement Act. *See* Tex.Rev.Civ. Stat. art. 4590i, § 1.03(a)(4) (defining health care liability claim).[4] This Act requires that health care liability claims be substantiated by a timely filed expert report. *Id.* § 13.01(d). Because Marks failed to file a timely expert report, the trial court granted the Hospital's motion to dismiss.

The court of appeals initially reversed, concluding that Marks's allegations concerned "an unsafe condition created by an item of furniture" and thus related to "premises liability, not health care liability[.]" *Marks*, 177 S.W.3d at 259. The Hospital appealed, filing its petition for

review a few days before we held, in *Diversicare General Partner, Inc. v. Rubio*, 185 S.W.3d 842 (Tex.2005), that a patient's claims against a nursing home for inadequate supervision and nursing services were health care liability claims.

After full briefing, we granted the Hospital's petition. Rather than parse through Marks's claims, however, we vacated the court of appeal's judgment without reference to the merits and remanded for the court of appeals to consider the nature of these claims in light of *Diversicare*. *St. Luke's Episcopal Hosp. v. Marks*, 193 S.W.3d 575 (Tex.2006) (per curiam). Following our remand, a divided court of appeals affirmed the trial court's dismissal for want of a timely expert report, concluding that Marks had asserted only health care liability claims. 229 S.W.3d at 402. One justice dissented in part, urging that Marks's fourth claim concerning the defective footboard was a premises-liability claim rather than a health care liability claim under the Medical Liability and Insurance Improvement Act. *Id.* at 403 (Jennings, J., dissenting in part).

## II

The Medical Liability and Insurance Improvement Act of 1977 was the Legislature's response to a crisis in the cost and availability of medical malpractice insurance in Texas. The Legislature perceived that an inordinate increase in the frequency and severity of health care liability claims had caused the crisis. Tex.Rev.Civ. Stat. art. 4590i, § 1.02(a)(1)-(5). The Legislature also found that this insurance crisis had adversely affected the cost and delivery of medical and health care in Tex-

---

4. Article 4590i was repealed after the filing of this case. *See* n. 1 *supra*. Similar medical liability legislation is now codified in Chapter 74 of the Texas Civil Practice and Remedies Code, affecting actions filed on or after September 1, 2003. *See* Tex. Civ. Prac. & Rem.Code §§ 74.301–.303.

as. *Id.* § 1.02(a)(6)-(9). To address the problem, the Legislature sought to reduce the "frequency and severity of health care liability claims through reasonable improvements and modifications in the Texas insurance, tort, and medical practice systems[.]" *Id.* § 1.02(b)(1). The Legislature's modifications included a damages cap, a shortened limitations period, and heightened filing requirements for health care liability claims. *See Diversicare*, 185 S.W.3d at 846–47.

The Act defines a "health care liability claim" as "a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care or health care or safety" proximately resulting in a patient's injury or death. Tex.Rev.Civ. Stat. art. 4590i, § 1.03(a)(4). The Act does not define safety, although it does define other terms, including "health care provider," "physician," "medical care," and "health care." *Id.* § 1.03(a)(2)-(4), (8).

These definitions indicate that physicians provide medical care, and health care providers furnish other health care services. "Medical care" is defined as the practice of medicine, including the diagnosis and treatment by a licensed physician. *Id.* § 1.03(a)(6). "Health care" is defined more broadly to include "any act or treatment performed or furnished, or which should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." *See id.* § 1.03(a)(3). Hospitals are expressly included in the definition of "health care provider." *Id.* § 1.03(a)(3).

Although *Diversicare* primarily concerned a claimed departure from accepted standards of health care, we mentioned safety and the absence of any statutory definition for the term. *Diversicare*, 185 S.W.3d at 855. We observed that the inclusion of accepted standards of safety expanded the statute's scope beyond what it would have been had the statute only covered medical care and health care. Because the statute offered no definition of safety, we suggested its commonly understood meaning, that is, " 'untouched by danger; not exposed to danger; secure from danger, harm or loss.' " *Id.* (quoting Black's Law Dictionary 1336 (6th ed.1990)). The term's meaning, however, was ultimately unnecessary to our decision, and so we left unresolved its contextual meaning, as well as its relationship to the other defined terms of medical care and health care. *See id.* The meaning of this term is squarely presented here as the parties dispute what the Legislature intended to include as a health care liability claim involving a "departure from accepted standards of ... safety[.]" Tex.Rev.Civ. Stat. art. 4590i, § 1.03(a)(4).

Marks contends that safety must be read narrowly to include only safety concerns directly related to the patient's care or treatment. The Hospital, on the other hand, argues that the term should be read broadly to include any patient injury negligently caused by an unsafe condition at a health care facility. Even if the definition is not this broad, the Hospital alternatively argues, it should include equipment used in the patient's care, such as the hospital bed here.

### III

To determine the meaning of safety in the context of this Act, we begin with established principles of statutory construction. The first and overarching principle is that we give effect to legislative intent. *See* Tex. Gov't Code § 312.005; *see also Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 383 (Tex.2000). When inter-

preting a statute, we read words and phrases in context and construe them according to the rules of grammar and common usage. Tex. Gov't Code § 311.011(a). Words that are not defined are given their ordinary meaning. *Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864, 865 (Tex.1999). When possible, all words are given effect and none of the statute's language is treated as surplusage. *Cont'l Cas. Ins. Co. v. Functional Restoration Assocs.*, 19 S.W.3d 393, 402 (Tex.2000). Thus, the terms medical care, health care, and safety should add meaning to the statute; none of the terms should be disregarded, discounted, or dismissed. *See Meritor Auto., Inc. v. Ruan Leasing Co.*, 44 S.W.3d 86, 89–90 (Tex. 2001).

The Legislature's purpose in article 4590i is clearly stated, to remedy "a medical malpractice insurance crisis" in Texas and its "material adverse effect on the delivery of medical and health care services in Texas[.]" Tex.Rev.Civ. Stat. art. 4590i, § 1.02(a)(5)-(6). This concern pervades the statute, which is replete with references to medical liability, health care, and malpractice, all of which implicate medical or health care judgments made by professionals. *See, e.g., id.* § 13.01(r)(5)-(6) (requiring expert to have knowledge of medical diagnosis, care, and treatment).

By comparison, neither the statute nor the historical background suggests that physicians or health care providers were similarly challenged when obtaining commercial general liability insurance coverage for ordinary, non-medical accidents on their premises. The Legislature was responding only to a medical-malpractice insurance crisis, and medical malpractice insurance generally does not cover premises liability claims. *See, e.g., N. Am. Specialty Ins. Co. v. Royal Surplus Lines Ins. Co.*, 541 F.3d 552, 561 (5th Cir.2008) (recogniz-ing that commercial general liability insurance policies generally exclude professional breaches from coverage).

All patient injuries in a health care setting, regardless of cause, may be said to implicate patient safety in the broader sense, but not all patient injuries involve malpractice. Given the statute's objective and the Legislature's express concern, the Legislature evidently did not intend to define safety as broadly as the Hospital proposes. Moreover, such an expansive interpretation conflicts with the Legislature's express intent that the statute operate to control medical-malpractice insurance costs without unduly restricting a patient's rights. *See* Tex.Rev.Civ. Stat. art. 4590i, § 1.02(b)(3); *see also O'Reilly v. Wiseman*, 107 S.W.3d 699, 707 n. 12 (Tex.App.-Austin 2003, pet. denied). We accordingly reject the Hospital's contention that a health care liability claim includes any patient injury negligently caused by an unsafe condition at a health care facility.

We said as much in *Diversicare*, noting that there could "be circumstances that give rise to premises liability claims in a healthcare setting" and that not every accidental injury to a patient in a health care setting would constitute a health care liability claim under article 4590i. *Diversicare*, 185 S.W.3d at 854 (indicating that a health care claim is determined by the nature of the claim, not the nature of the defendant). As noted, a health care liability claim is defined to include a "claimed departure from accepted standards of medical care or health care or safety." Tex.Rev.Civ. Stat. art. 4590i, § 1.03(a)(4). Standards of medical care or health care are implicated when the negligent act or omission is an inseparable or integral part of the rendition of medical services. *Diversicare*, 185 S.W.3d at 848–49. Similarly, an accepted standard of safety is implicated under the

Act when the unsafe condition or thing is an inseparable or integral part of the patient's care or treatment. *See id.* at 855.

In determining whether the plaintiff's claim is inseparable from the rendition of medical services, and thus a health care liability claim, we are guided by several overlapping factors. They include (1) whether the specialized knowledge of a medical expert may be necessary to prove the claim, (2) whether a specialized standard in the health care community applies to the alleged circumstances, and (3) whether the negligent act involves medical judgment related to the patient's care or treatment. *See Diversicare,* 185 S.W.3d at 847–52. Not surprisingly, these factors confirm the significance that medical or professional judgment plays in classifying the claim as one involving health care liability.

### IV

Marks's original petition asserted four negligence claims against the Hospital. The first three—failing to properly train and supervise its agents, employees, servants and nursing staff when caring for him; failing to provide him with the assistance he required for daily living activities; and failing to provide him a safe environment in which to receive treatment and recover—are similar to those in *Diversicare.*

In that case, a nursing home resident's daughter sued on her mother's behalf, alleging the nursing home had been negligent in failing to provide enough staff and supervision to prevent her mother from falling on two occasions and from being sexually assaulted by another nursing home resident. *Id.* at 845. The trial court concluded that the allegations constituted health care liability claims, dismissing the case because the plaintiff had not filed the requisite expert report. *See* Tex.Rev.Civ.

Stat. art. 4590i, § 13.01(d), (e). The court of appeals reversed, concluding that the sexual-assault claim did not fit the definition of a health care liability claim. *Rubio v. Diversicare Gen. Partner, Inc.,* 82 S.W.3d 778, 783–84 (Tex.App.-Corpus Christi 2002), *rev'd,* 185 S.W.3d 842 (Tex. 2005). We disagreed, however, concluding that all the plaintiff's claims were based on an alleged departure from accepted standards of health care. *Diversicare,* 185 S.W.3d at 849. We noted that nursing homes provide services to their residents that include supervision of daily activities, routine examinations, monitoring of the residents' physical and mental condition, administering medication, "and meeting the fundamental care needs of the residents." *Id.* We further noted that these services are provided by professional staff, and "[t]he level and types of health care services provided vary with the needs and capabilities, both physical and mental, of the patients." *Id.* at 849–50 (citing *Harris v. Harris County Hosp. Dist.,* 557 S.W.2d 353, 355 (Tex.Civ.App.-Houston [1st Dist.] 1977, no writ)). We then concluded that those services, including the monitoring and protection of the patient, as well as training and staffing policies, were "integral components of Diversicare's rendition of health care services[.]" *Id.* at 850. Similarly, Marks's first three claims here, involving patient supervision and staff training, are claims implicating professional expertise and the departure from the accepted standard of health care. Such claims are health care liability claims subject to the Act. Tex.Rev.Civ. Stat. art. 4590i, § 1.03(a)(4).

Marks's hospital bed claim is different, however, because it does not assert a departure from the accepted standards of medical care or health care. Instead, Marks alleges that the Hospital was negligent in the bed's assembly or maintenance,

or both, and that a defectively attached footboard presented an unsafe condition. At its core, Marks's hospital bed claim involves the failure of a piece of equipment. Whether the failure of that equipment qualifies as a health care liability claim depends on whether that failure constitutes a departure from accepted standards of safety under article 4590i. *Id.* To assist us in answering that question, we consider the various factors indicative of professional judgment, that being the equipment's use and importance in the patient's care or treatment.

No evidence shows that the assembly of Marks's hospital bed involved any medical or professional judgment, or that the bed's footboard or its assembly were related to, or affected by, Marks's care or treatment. To the contrary, Marks presented some evidence that the assembly of the hospital bed was solely the responsibility of the Hospital's maintenance staff. Presumably, tasks performed by the maintenance staff do not require any specialized health care knowledge, and evaluation of whether those tasks were performed negligently would not require expert medical testimony. Other jurisdictions have, for the most part, found claims based on injuries incurred when a hospital fixture or piece of equipment breaks due to negligent assembly, maintenance, or repair to sound in ordinary, rather than medical, negligence.[5]

A cause of action alleges a departure from accepted standards of safety within the Act's meaning when the unsafe condition is an inseparable or integral part of the patient's care or treatment. An unsafe condition, like a negligent act or omission, is inseparable from the rendition of medical or health care services when the relationship between the two is significant and direct, and thus involves professional judgment. The following cases illustrate this point.

In *Hector v. Christus Health Gulf Coast,* the court of appeals held that a patient's action for injuries in a fall from an operating table during surgery was based on "an alleged departure from accepted standards of safety" under article 4590i. 175 S.W.3d 832, 835–36 (Tex.App.–Houston [14th Dist.] 2005, pet. denied). The patient argued that the operating table was under the hospital's control and that the accident involved an administrative or routine use rather than medical care. *Id.* at 836. The court of appeals agreed in theory with the "distinction between hospital workers that were health care providers, such as nurses and doctors, and hospital workers that were not, such as cooks or electricians." *Id.* But the court concluded the distinction was irrelevant because "any person in the operating room at the time of Hector's accident would necessarily have been con-

5. *See, e.g., Williamson v. Hosp. Serv. Dist. No. 1 of Jefferson,* 888 So.2d 782, 789–90 (La. 2004) (holding that hospital's negligence in failing to repair and inspect wheelchair prior to returning it to service was ordinary not medical negligence to which state's medical malpractice statute did not apply); *Pluard v. Patients Compensation Fund,* 705 N.E.2d 1035, 1037–38 (Ind.App.1999) (holding that injuries incurred when surgical lamp inadequately attached to the wall fell on patient not covered by Indiana's Medical Malpractice Act); *Harts v. Caylor–Nickel Hosp., Inc.,* 553 N.E.2d 874, 879 (Ind.App.1990) (concluding that injury incurred when bed rail collapsed, causing patient to fall, were premises liability claims not covered by Medical Malpractice Act); *but see Prater v. Smyth County Cmty. Hosp.,* No. 93–4050, 1995 WL 1055761, at *2–3 (Va.Cir.Ct. Jan. 30, 1995) (not designated for publication) (holding that a bed rail collapse while taking patient's medical history was an integral part of the health care treatment and covered by Virginia's Medical Malpractice Act).

sidered a health care provider." *Id.* The distinction is relevant in this case, however, because the hospital workers responsible for assembling Marks's bed, identified by the hospital nurses as the maintenance team, would not have been considered health care providers when doing so.

In another case, a patient sued a hospital for a foot injury caused by stepping on a sharp paint chip while showering in preparation for surgery. *Shults v. Baptist St. Anthony's Hosp. Corp.*, 166 S.W.3d 502, 503 (Tex.App.-Amarillo 2005, pet. denied). The patient alleged negligence based both on the hospital's failure to maintain and keep safe its shower as well as on the hospital's treatment of his foot injury. The court rejected the argument that the negligence claims based on the condition of the hospital shower constituted claims resulting from departures from accepted standards of safety under article 4590i:

> We agree with [hospital's] characterization of [patient's] claims as involving two distinct theories of recovery, one based upon premises liability and the other on medical negligence. Personal injury claims resulting from departures from accepted standards of safety may be included within the scope of article 4590i, but such departures must be inseparable parts of the rendition of medical services and the standards of safety within the health care industry to be covered by

the Act. We do not believe that the presence of a sharp paint chip in the shower of [patient's] hospital room could be considered in any way an inseparable part of the medical services rendered to [patient].

*Id.* at 505.

The shower was, however, taken in preparation for surgery at a physician's instruction. *Id.* at 503. In that sense, it was a functional part of the surgical services provided by the hospital, just as the footboard attached to the hospital bed here was a functional part of the morphine-treatment and recovery services provided to Marks. The source of the negligence in both cases, however, is not directly related to the rendition of any medical or health care services, but instead is incidental, occurring in the course of the Hospital's general maintenance duties which do not involve health care professionals or the exercise of any medical or professional judgment.

There are certainly circumstances in which the assembly or use of a hospital bed might involve professional judgment, the evaluation of which would likely require expert testimony. For instance, a health care provider might determine that a patient's condition called for restraints and that side rails attached to the bed would suffice.[6] Thus, the failure of a part

---

6. *See, e.g., Bryant v. Oakpointe Villa Nursing Centre, Inc.*, 471 Mich. 411, 684 N.W.2d 864, 867 (2004) (determining that claims based on nursing home's failure to recognize the risk posed by the configuration of bed rails on a hospital bed sounded in medical malpractice); *Bell v. West Harrison County Dist.*, 523 So.2d 1031, 1033 (Miss.1988) (determining that a patient's claims arising from a nurse's failure to raise side rails on a hospital bed constituted medical malpractice, rather than ordinary negligence, claims because "[a] nurse's decision as to whether or not bed rails should be utilized entails a degree of knowledge con-

cerning the subject patient's condition, medication, history, etc."); *Lenny v. Loehmann*, 78 A.D.2d 813, 433 N.Y.S.2d 135 (N.Y.App.Div. 1980) (concluding that a physician's alleged negligence in failing to instruct that bed's side rails be raised, or in failing to check condition of the side rails after they had been put up, or in failing to supervise patient's movements to and from bed sounded in medical malpractice rather than ordinary negligence); *cf. Gould v. N.Y. Cty. Health and Hosp. Corp.*, 128 Misc.2d 328, 490 N.Y.S.2d 87, 88–89 (N.Y.Sup.Ct.1985) (concluding that a plaintiff's claim that hospital bed side railings

of a hospital bed specifically ordered by a physician or health care provider and integral to the patient's care or treatment might implicate article 4590i. *See, e.g., Espinosa v. Baptist Health System*, No. 04–05–00131–CV, 2006 WL 2871262 (Tex. App.-San Antonio Oct. 11, 2006, pet. denied) (mem. op.) (holding that patient injured while using an overhead bed-frame device or trapeze authorized as part of patient's medical care and installed by a nurse and orthopedic technician was a health care liability claim). But when a piece of hospital equipment is unrelated to any professional judgment and is merely incidental to the patient's care, its alleged unsafe condition does not implicate article 4590i. We conclude that the negligence claim based on the defectively assembled or maintained hospital bed in this case is not a health care liability claim to which article 4590i applies.

JUSTICE JOHNSON's dissent, however, questions that conclusion as permitting Marks to convert a health care liability claim into an ordinary negligence claim by mere pleading. The dissent submits that "no matter how Marks pleads his case, the substantive facts implicate questions about whether St. Luke's met accepted standards of health care and safety [as to its patient]." 319 S.W.3d at 669 (Johnson, J. dissenting). We disagree, and our disagreement concerns the essence of a health care liability claim.

JUSTICE JOHNSON's dissent assumes that a patient's claim against a hospital must implicate accepted standards of health care and safety by definition. But it is not the identities of the parties or the place of injury that defines the claim. *See Diversicare*, 185 S.W.3d at 854 (refusing to distinguish patient claims " 'simply because the landowner is a health care provider' "). Rather, it is the cause of the injury and its relationship to medical or professional judgment that determines the claim's nature and the application of the Medical Liability and Insurance Improvement Act. *See* TEX.REV.CIV. STAT. art 4590i, § 1.03(a)(2), (4) (defining "health care" and "health care liability claim" as act or omission during patient's medical care, treatment or confinement that departs from accepted standards). Thus, injury caused by a failure to train and supervise the hospital's nursing staff or by a failure to supervise and assist the patient implicates the Act; that is, it involves a departure from accepted standards during a patient's medical care, treatment, or confinement. A claim involving a defective footboard, on the other hand, does not appear to implicate any medical or professional judgment [7] and was not in this case directly related to the patient's care, treatment, or confinement. Hence, we conclude in this case that the injury allegedly caused by the defective footboard was not a health care liability claim under the Act.

JUSTICE JOHNSON's dissent also accuses the Court of "conflating standards of safety with standards of health care," but our

---

"were defective and not properly raised" constituted an ordinary negligence claim).

**7.** JUSTICE WAINWRIGHT's dissent agrees that *Diversicare* did not define safety and that the proper focus when addressing standards of safety should be on "whether medical judgment was employed in the equipment's use and its importance to the patient's care."

319 S.W.3d at 666–67 (Wainwright, J. dissenting). His apparent disagreement with the Court concerns the defective footboard's significance in the patient's care and treatment and its relationship to the medical or professional judgments made in the case. JUSTICE HECHT's dissent similarly views the defective footboard as an inseparable part of the professional negligence claim.

intention is just the opposite. 319 S.W.3d at 667–73 (Johnson, J. dissenting). "Standards of medical care or health care or safety" should each add something to the definition of "health care liability claim." None of these standards should be read so broadly as to subsume the others. Thus, standards of medical care and health care implicate the acts or omissions of physicians and other health care providers, respectively, while standards of safety concern a patient's exposure to unreasonably dangerous or defective conditions or things in the course of treatment. The dissent, however, reads safety so broadly as to subsume all duties—not only standards of medical care and health care, but also the breach of any other duty regardless of its connection to patient care or treatment. *See* 319 S.W.3d at 664 (Johnson, J. dissenting) (noting that "a safety-related cause of action is a health care liability claim" whenever a patient sues a health care provider or physician for a breach of duty involving safety). As we indicated in *Diversicare,* the focus must be on the gravamen of the claim, which is not determined merely by the defendant's status as a health care professional or the place of injury. *See Diversicare,* 185 S.W.3d at 854. We accordingly disagree that article 4590i makes every patient's claim against a health care professional a health care liability claim.

## V

Although we have concluded that Marks's other negligence claims involving patient supervision and staff training are health care liability claims, a question remains concerning their dismissal. Marks argues that these claims should not have been dismissed because he was entitled to additional time to provide an expert report. Article 4590i generally requires a claimant to furnish an expert report within 180 days after the filing of a health care liability claim. Tex.Rev.Civ. Stat. art. 4590i, § 13.01(d). If a claimant fails to comply with this requirement, the court is directed, on motion, to award appropriate costs and fees and to dismiss the health care liability claim with prejudice. *Id.* § 13.01(e). The 180–day period can be extended, however, for good cause and enlarged for accidents and mistakes. *Id.* § 13.01(f), (g). The latter enlargement is referenced in the statute as a grace period. *Id.* § 13.01(g).

Marks contends that he was entitled to this grace period because his failure to file the expert report on time was an accident or mistake within section 13.01(g)'s meaning. That section provides for a thirty-day grace period if, after a hearing, the court finds that the claimant's failure to file a timely expert report was a mistake or accident rather than intentional or the result of conscious indifference.[8] After hearing the Hospital's motion to dismiss and Marks's motion for a grace period, the trial court found that Marks's failure was not an accident or mistake and dismissed the suit. We review that dismissal under an abuse of discretion standard. *Am.*

---

8. Section 13.01(g) of article 4590i provides:
   Notwithstanding any other provision of this section, if a claimant has failed to comply with a deadline [for filing the expert report] established by Subsection (d) of this section and after hearing the court finds that the failure of the claimant or the claimant's attorney was not intentional or the result of conscious indifference but was the result of an accident or mistake, the court shall grant a grace period of 30 days to permit the claimant to comply with that subsection. A motion by a claimant for relief under this subsection shall be considered timely if it is filed before any hearing on a motion by a defendant under Subsection (e) of this section.

*Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 875 (Tex.2001).

In support of Marks's motion for a grace period, Marks's attorney, James E. Doyle, provided his affidavit. Doyle averred that he was Marks's second attorney, becoming lead counsel about seven months after the first attorney filed the case. Doyle further averred that he and Marks's first attorney "understood the case to be an ordinary negligence case, not a health care liability claim" at that time. According to Doyle's affidavit, it was only after discovery that he determined that Marks also had a potential health care liability claim, causing him to amend the pleadings and provide an expert report. This report was provided more than 500 days after the filing of Marks's original petition.

The amended petition divided Marks's claims under headings of "Negligence" and "Premises Liability." The original petition had lumped all claims under a single negligence heading. In the amended pleading, Marks included complaints about his bed, his care, and his supervision under the "Negligence" heading. Under the "Premises Liability" heading, Marks complained about the condition of the hospital bed. Doyle avers that he "believed that the case presented claims sounding only in ordinary negligence" until the time he filed the amended pleading.

In our view, no significant difference exists between the original and the amended pleading. The underlying factual complaint in both concern the same set of circumstances: inadequate care and supervision by the Hospital's professional staff and a dangerous hospital bed. "It is well settled that a health care liability claim cannot be recast as another cause of action to avoid the requirements of [article 4590i]." *Diversicare,* 185 S.W.3d at 851. Determining whether a pleading states a

health care liability claim thus depends on its underlying substance, not its form. Doyle's affidavit does not clearly indicate what caused him to recognize for the first time that his client had a health care liability claim.

Equally significant, however, is the absence of any evidence explaining the first attorney's failure to furnish an expert report during the first seven months he represented Marks. Doyle's affidavit suggests that the first attorney also mistakenly believed that the original petition did not implicate article 4590i. According to the affidavit, Doyle's belief is based on his review of the case file he inherited. Affidavits, however, must be based on personal knowledge, not supposition. *See* Tex.R. Evid. 602 ("A witness may not testify to a matter unless ... the witness has personal knowledge of the matter."). An affidavit not based on personal knowledge is legally insufficient. *Kerlin v. Arias,* 274 S.W.3d 666, 668 (Tex.2008) (per curiam). Because Doyle had no personal knowledge of the first lawyer's intent, and the first lawyer did not provide his own affidavit explaining his failure, there is no evidence of mistake or accident and thus no basis for the requested grace period. Accordingly, the trial court did not abuse its discretion in denying Marks's motion for a grace period under section 13.01(g) and did not err in dismissing Marks's health care liability claims. *See* Tex.Rev.Civ. Stat. art. 4590i, § 13.01(e)(3) (stating that dismissal is "with prejudice to the claims refiling").

\* \* \*

To summarize, article 4590i does not apply to Marks's claim concerning the defective hospital bed footboard because that claim concerns ordinary, not medical, negligence and thus is not a health care liability claim. Marks's other claims alleging negligent care and supervision are health

care liability claims to which article 4590i does apply. Finally, Marks is not entitled to have the period for filing an expert report enlarged under the grace period provision of article 4590i because he has not established that the failure to comply with the statute was a mistake or accident.

The judgment of the court of appeals is affirmed in part and reversed in part, and the cause is remanded to the trial court for further proceedings consistent with our opinion.

David Medina
Justice

OPINION DELIVERED: August 28, 2009

Justice GUZMAN, concurring and dissenting.

I join CHIEF JUSTICE JEFFERSON's concurrence and dissent for the reasons he explains, namely that (1) our holding in *Diversicare* requires a health care liability claim to involve an act or omission that is inseparable from the provision of health care, *see Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 854 (Tex.2005), and (2) the footboard on Marks's hospital bed was not an integral part of St. Luke's delivery of health care services to Marks. I write separately, however, because of an additional concern I have with the Court's judgment. The Medical Liability and Insurance Improvement Act (MLIIA) was enacted to remedy a medical malpractice insurance crisis in Texas. TEX.REV.CIV. STAT. art. 4590i, § 1.02(a)(5)-(6) (repealed 2003).[1] By sweeping even simple negligence claims under the umbrella of medical malpractice insurance policies, the

Court risks broadening the class of claims that medical malpractice insurance companies must cover. This, I fear, will thwart the very purpose of the MLIIA, which is to reduce the cost of medical malpractice insurance in Texas so that patients can have increased access to health care. *See id.* § 1.02(a)(4)-(5).

Health care providers generally carry both a malpractice policy to cover health care liability claims and a general liability policy to cover ordinary negligence. *See Diversicare*, 185 S.W.3d at 862 (O'Neill, J., dissenting) (citing *Cochran v. B.J. Servs. Co. USA*, 302 F.3d 499, 502 (5th Cir.2002)). As the dissent explained in *Diversicare*, when courts determine that a claim is a health care liability claim, expenses related to that litigation likely will fall under the malpractice policy instead of the general liability policy. *Id.* Thus:

> the adoption of an overly broad interpretation of "health care liability claim" could ... hinder the Legislature's goal of ensuring that medical malpractice insurance is available at a reasonable cost: if courts sweep even ordinary negligence claims into the ambit of the MLIIA, then malpractice insurers may end up covering more of those claims. Malpractice insurance rates would then continue to rise as those insurance policies are required to cover claims that were not contemplated under the insurance contracts.

*Id.* at 863.

As CHIEF JUSTICE JEFFERSON notes in his dissent, a variety of fixtures in a hospital enable doctors to provide medical services, many of which are merely incidental to the provision of health care services. In holding that even a hospital bed footboard is

---

1. Medical Liability and Insurance Improvement Act of Texas, 65th Leg., R.S., ch. 817, § 1.02(a)(5)-(6), 1977 Tex. Gen. Laws 2039, 2040, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884. Similar medical liability legislation is now codified in Chapter 74 of the Texas Civil Practice and Remedies Code.

an integral and inseparable part of the delivery of health care services, it is unclear what acts of ordinary negligence occurring in a health care setting, if any, might still fall within the scope of premises liability rather than health care liability. The Legislature did not intend for the MLIIA to convert an ordinary, nonmedical negligence claim, like the one here, into a health care liability claim. Because the Court's interpretation of the statute contradicts this express intent, I join CHIEF JUSTICE JEFFERSON in concurring and dissenting from the Court's judgment.