# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-10-00086-CV

---

**David Cardwell, M.D., Appellant**

**v.**

**Marianne McDonald, Appellee**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT
NO. D-1-GN-08-004068, HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING**

---

## O P I N I O N

In this interlocutory appeal, we consider whether a suit for money damages against a physician constitutes a "health care liability claim" subject to the expert-report requirement of the Texas Medical Liability Act (TMLA),[1] an issue litigated so frequently nowadays that recent opinions of the Texas Supreme Court have begun abbreviating that statutory term "HCLC."[2] Making this case somewhat unique, however, is that the claimant, appellee Marianne McDonald, alleges in part that

---

[1] *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a) (West 2011) ("In a health care liability claim, a claimant shall, not later than the 120th day after the date the original petition was filed, serve on each party or the party's attorney one or more expert reports, with a curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted."); *see generally id.* §§ 74.001-.507 (West 2011).

We have generally cited to the current codification of the TMLA for convenience.

[2] *See, e.g.*, *Omaha Healthcare Ctr., LLC v. Johnson*, No. 08-0231, 2011 Tex. LEXIS 506 (Tex. July 1, 2011); *Harris Methodist Fort Worth v. Ollie*, No. 09-0025, 2011 Tex. LEXIS 358 (Tex. May 13, 2011) (per curiam). We have used the same abbreviation herein.

the physician, appellant David Cardwell, M.D., a psychiatrist, conducted a "counseling" session under false pretenses in order to gain or generate information for McDonald's husband to use against her in a divorce proceeding.

Perceiving that her suit was not an HCLC and, thus, did not implicate the TMLA's expert-report requirement, McDonald made no attempt to serve a report. Contending that McDonald's suit was an HCLC, Cardwell moved to dismiss after the TMLA's 120-day deadline for serving expert reports expired.[3] The district court denied the motion in full. Cardwell appeals the district court's order.[4] On this record, we conclude that although some of McDonald's factual allegations state an HCLC that the TMLA requires to be dismissed, her complaints of misleading or deceitful conduct calculated to aid her husband in divorce litigation do not, and that her theories of recovery predicated solely on the latter facts do not overlap with the facts underlying her HCLC in the manner that the Texas Supreme Court has held to require dismissal of both.

**BACKGROUND**

The record before the district court consisted of McDonald's petition and a summary-judgment affidavit from Cardwell that McDonald attached to her response in opposition to

---

[3] *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(b) ("If, as to a defendant physician or health care provider, an expert report has not been served within the period specified by Subsection (a), the court, on the motion of the affected physician or health care provider, shall . . . enter an order that: (1) awards to the affected physician or health care provider reasonable attorney's fees and costs of court incurred by the physician or health care provider; and (2) dismisses the claim with respect to the physician or health care provider, with prejudice to the refiling of the claim.").

[4] *See id.* § 51.014(a)(9) (West 2008) (permitting appeal from interlocutory order of trial court that "denies all or part of the relief sought by a motion under [civil practice and remedies code] Section 74.351(b)").

2

Cardwell's dismissal motion.[5]  McDonald alleges, and Cardwell's affidavit confirms, that Cardwell is a medical doctor licensed in Texas who practices psychiatry in Austin and who, at relevant times, was treating McDonald's husband, Brian.  Although Brian[6] was a patient of Cardwell's,[7] it is undisputed that neither party regarded McDonald to be a patient at any time.[8] Instead, McDonald alleges, she "was requested to attend a treatment session with her husband under the pretense that the session was for the purpose of marriage counseling."  We note that McDonald does not allege that Cardwell himself, as opposed to Brian, communicated this request to McDonald, and that Cardwell avers without dispute that he had never spoken to McDonald or even met her before the "treatment session."  McDonald alleges the following additional facts:

> Plaintiff and her husband met with Defendant for "marriage counseling" sessions on November 10 and 11, 2006.  In fact, Defendant's purpose was to obtain information regarding Plaintiff to assist Plaintiff's husband in a pending divorce proceeding. Defendant then produced written statements for use in the divorce proceeding that contained a psychiatric diagnosis of Plaintiff even though Plaintiff was not his patient.  Specifically, Defendant stated that Plaintiff suffered from "progressive paranoid thought disorder."  Not only [was] the diagnosis unauthorized and unethical, [it was] also false.

Based on these factual allegations, McDonald pleads six liability theories against Cardwell:

---

[5] The title of the affidavit indicates that Cardwell had originally prepared it in support of a summary-judgment motion he had filed.  McDonald relied on the affidavit to establish that she was never a patient of Cardwell's.  However, the affidavit in its entirety was before the district court.

[6] We will use his first name as necessary to avoid confusion with the appellee.

[7] Cardwell's affidavit indicates that Brian had been his patient for over a decade.

[8] McDonald alleges, "At no time was the Plaintiff ever a patient of Defendant."  Likewise, Cardwell averred, "I never considered her as a patient."

3

- intentional infliction of emotional distress, predicated on "Defendant's conduct in misleading Plaintiff as to the nature and purpose of the 'marriage counseling' sessions."

- defamation, predicated on Cardwell's publication of a statement "asserting as fact that Plaintiff suffered from serious psychiatric problems," i.e., "progressive paranoid thought disorder," which was "false because the claimed diagnosis is incorrect and was known by Defendant to be incorrect at the time it was given."

- invasion of privacy, for publicizing "information about Plaintiff's private life."

- fraud, predicated on Cardwell's "knowingly" "false" representations "that she was being requested to attend sessions with her husband for the purposes of marriage counseling."

- tortious interference with a business relationship, for "providing information detrimental to Plaintiff's standing" within a health insurance services company in which she and her husband owned interests.

- DTPA claims (false, misleading, and deceptive acts or practices and unconscionable action or course of action) in connection with "services" McDonald sought from Cardwell "in the form of marriage counseling."

In his affidavit, Cardwell acknowledges that he met with McDonald and Brian on November 10 and 11, 2006, and that he subsequently communicated what purported to be his impressions regarding McDonald's psychiatric condition to Brian via email. However, in addition to denying that he had subjectively intended to aid Brian in a divorce proceeding[9] or misled McDonald regarding the purpose of the sessions[10]—matters that ultimately go to the merits rather

---

[9] Cardwell avers that, in fact, there was no "pending divorce proceeding" at the time of his complained-of actions, and that the divorce proceeding was initiated only thereafter—by McDonald. He denies that the prospect of divorce was ever mentioned by either Brian or McDonald prior to that time. After McDonald initiated the divorce proceeding, according to Cardwell, Brian, without his knowledge or consent, shared Cardwell's diagnosis or assessment of McDonald with Brian's divorce lawyer, who then used the email as a weapon in a preliminary child-custody hearing. Cardwell adds that he was subpoenaed to testify (unwillingly) in the proceeding, but that the couple—to his "delight"—ultimately reconciled.

[10] Cardwell repeatedly emphasizes his "transparency" in his statements to McDonald.

4

than the nature of McDonald's claim[11]—Cardwell testifies to a number of additional facts regarding the context and circumstances of his actions that can inform our analysis of whether McDonald has asserted an HCLC.[12] According to Cardwell, Brian, his longtime patient, sought his assistance in regard to a "crisis situation" that had developed at the business in which Brian and McDonald were involved. Brian, Cardwell recounts, expressed concern that McDonald had become fixated on what Brian regarded as a false and irrational belief that the couple was being cheated by a business partner, leading to increasingly erratic, hostile, and aggressive behavior on her part. Brian claimed, according to Cardwell, that McDonald's behavior had escalated to her committing acts of violence at the business—including assaulting his business partner's mother—prompting an executive decision to remove McDonald from active involvement with the company. Brian purportedly also expressed concern about strain and damage the behavior was inflicting on the couple's marriage and family life.

Cardwell avers that Brian "asked if I could meet with the two of them" to aid Brian in breaking the news to McDonald that she was being removed from active involvement in the business. Anticipating that the news "might enrage Mrs. McDonald anew," Brian, according to Cardwell, "requested that he be able to use the neutral setting of a meeting in my office to inform

---

[11] *See Nexus Recovery Ctr., Inc. v. Mathis*, 336 S.W.3d 360, 367 (Tex. App.—Dallas 2011, no pet.) (observing that ultimate viability of plaintiff's causes of action is "a matter not relevant to [an] interlocutory appeal" concerning whether plaintiff had asserted an HCLC).

[12] *See, e.g.*, *Strobel v. Marlow*, No. 05-09-01047-CV, 2011 Tex. App. LEXIS 2012, *12-13 (Tex. App.—Dallas Mar. 21, 2011, no pet. h.) (considering "undisputed evidence" in determining whether, as a matter of law, defendant was a "health care provider" such that suit was subject to TMLA's expert-report requirement); *Christus Health v. Beal*, 240 S.W.3d 282, 287 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (considering evidence of facility's function to determine whether it was a "health care provider" under the TMLA).

her that he was doing this and to provide her an opportunity to react, but then hopefully to have a constructive conversation about the matter in my presence." At the same time, Cardwell adds, Brian also asked him to "observe his wife's behavior and, in doing so, help him in dealing with her in the immediate term when he told her that she would have to leave her position with the business," and then "participating" in the discussions that followed in a manner "hopefully protect[ing] their personal relationship in his wish to preserve their family."

Cardwell agreed to meet with the couple on November 10. He claims to have had no communications with McDonald in advance of the meeting and, in fact, had never met her before she showed up at his office with Brian at the appointed time. Then, Cardwell avers:

- "I, as requested initially by Mr. McDonald, provided a setting for the couple to have a civil discussion of specific issues. At the beginning of the meeting this was explained to Mrs. McDonald . . . . Mr. McDonald and Mrs. McDonald then concurred in the request that as a psychiatrist I serve to facilitate the subsequent discussions."

- "At the beginning of the first meeting, I told Mrs. McDonald that the purpose of the meeting was to talk about the fact that Mr. McDonald was worried about psychological issues with her and her increasingly aberrant behavior; that Mr. McDonald was concerned for their family and their business; and that Mr. McDonald had asked that I observe and talk with her."

- "Mrs. McDonald consented to stay in the room for the next 3-4 hours with Mr. McDonald and me under these conditions."

- "I spent another 3-4 hours with Mrs. McDonald and Mr. McDonald the following day, a Saturday, November 11, 2006, at the request of Mrs. McDonald."

- "Mr. McDonald was initially present [at the November 11 meeting]. He then departed so that Mrs. McDonald could talk with me with him not present, allowing her to ask any questions that she wished about my observations that had been presented to me. She left that meeting expressing appreciation for the time that I had spent with both of them on the matter."

6

"During the two sessions on both November 10 and 11, 2006," Cardwell continued, "Mrs. McDonald exhibited the type of behavior that Mr. McDonald was worried about and had talked to me about." Specifically, Cardwell explains, "[t]he delusional thought content that I observed in Mrs. McDonald . . . was of the persecuting type and accompanied paranoid traits in her personality." Cardwell claims that he shared this assessment with the couple during the sessions. McDonald, Caldwell continues, "indicated that she had decided to seek a second opinion," and "eventually sought treatment with an Austin-area psychiatrist who implemented treatment with a medication of the type that I had explained to Mrs. McDonald was often beneficially used in cases of this clinical nature."

Thereafter, on December 6, 2006, in response to an email he received from Brian, Cardwell acknowledges that he wrote an email "setting forth the alternatives and options that I saw for him on how best to lead his family after he had made himself fully available for participating in and supporting his wife's recovery from what had been in my opinion, based on what I had observed, a 'progressive paranoid thought disorder' that had produced conflict in social relationships, then in and at the business (work) of the family, and then in the family and marriage itself."[13]

## ANALYSIS

In a single issue on appeal, Cardwell urges that the district court abused its discretion in denying his motion to dismiss because the TMLA required McDonald to file an expert report and it is undisputed that she made no attempt to do so. In general, we apply an abuse-of-discretion standard of review to trial court orders granting or denying a motion to dismiss for failure to comply

---

[13] The email itself is not in the record.

with the TMLA's expert-report requirement, ascertaining whether the trial court has acted in an "arbitrary" or "unreasonable" manner or "without reference to any guiding rules or principles." *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002); *see American Transitional Care Ctrs. v. Palacios*, 46 S.W.3d 873, 877 (Tex. 2001). However, the Legislature has imposed on trial courts a mandatory duty to dismiss (i.e., deprived them of any discretion not to do so) where a plaintiff has failed to serve even a deficient expert report within the 120-day statutory period. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(b) (West 2011); *Scoresby v. Santillan*, No. 09-0497, 2011 Tex. LEXIS 516, at *21-22 (Tex. July 1, 2011) (citing *Ogletree v. Matthews*, 262 S.W.3d 316, 320-21 (Tex. 2007)). Consequently, the district court would have abused its discretion in failing to dismiss if, as Cardwell contends, the TMLA required McDonald to serve an expert report. Resolution of that issue turns principally on construction of the TMLA, a question of law that we review de novo. *See Drewery v. Adventist Health Sys./Tex., Inc.*, No. 03-10-00334-CV, 2011 Tex. App. LEXIS 3895, at *9 (Tex. App.—Austin May 20, 2011, pet. filed) (citing *Marks v. St. Luke's Episcopal Hosp.*, 319 S.W.3d 658, 663 (Tex. 2010) (plurality op.)); *Carroll v. Humsi*, No. 03-09-00292-CV, 2011 Tex. App. LEXIS 2892, at *4-5 (Tex. App.—Austin April 13, 2011, no pet.).

Our primary objective in statutory construction is to give effect to the Legislature's intent. *See State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). We seek that intent "first and foremost" in the statutory text. *Lexington Ins. Co. v. Strayhorn*, 209 S.W.3d 83, 85 (Tex. 2006). "Where text is clear, text is determinative of that intent." *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009) (op. on reh'g) (citing *Shumake*, 199 S.W.3d at 284; *Alex Sheshunoff Mgmt. Servs. v. Johnson*, 209 S.W.3d 644, 651-52 (Tex. 2006)). We consider the words in context, not in isolation. *State v. Gonzalez*, 82 S.W.3d 322, 327 (Tex. 2002). We rely on the plain

meaning of the text, unless a different meaning is supplied by legislative definition or is apparent from context, or unless such a construction leads to absurd results. *See Entergy Gulf States, Inc.*, 282 S.W.3d at 437; *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625-26 (Tex. 2008); *see also* Tex. Gov't Code Ann. § 311.011 (West 2005) ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage," but "[w]ords and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly."). We also presume that the Legislature was aware of the background law and acted with reference to it. *See Acker v. Texas Water Comm'n*, 790 S.W.2d 299, 301 (Tex. 1990). We further presume that the Legislature selected statutory words, phrases, and expressions deliberately and purposefully. *See Texas Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010); *Shook v. Walden*, 304 S.W.3d 910, 917 (Tex. App.—Austin 2010, no pet.). Our analysis of the statutory text may also be informed by the presumptions that "the entire statute is intended to be effective" and that "a just and reasonable result is intended," Tex. Gov't Code Ann. § 311.021(2), (3) (West 2005), and consideration of such matters as "the object sought to be attained," "circumstances under which the statute was enacted," legislative history, "common law or former statutory provisions, including laws on the same or similar subjects," and "consequences of a particular construction." *Id.* § 311.023(1)-(5) (West 2005). However, only when the statutory text is ambiguous "do we 'resort to rules of construction or extrinsic aids.'" *Entergy Gulf States, Inc.*, 282 S.W.3d at 437 (quoting *In re Estate of Nash*, 220 S.W.3d 914, 917 (Tex. 2007)).

The TMLA's expert-report requirement applies to a "claimant" "[i]n a health care liability claim." *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a) (West 2011). A "claimant" is

9

defined, in pertinent part, as "a person, including a decedent's estate, seeking or who has sought recovery of damages in a health care liability claim." *Id.* § 74.001(a)(2) (West 2011). Consequently, the question of whether McDonald is a "claimant" collapses into the issue of whether she is seeking recovery of damages "in" an HCLC against Cardwell. The TMLA defines "health care liability claim" as:

> a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

*Id.* § 74.001(a)(13). As the Texas Supreme Court has suggested, this definition consists of three basic components or elements: (1) a physician or health care provider must be the defendant, (2) the "cause of action" must be about a patient's "treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care," and (3) that act, omission, or other departure by the defendant must be the alleged proximate cause of the claimant's professed injury. *Marks*, 319 S.W.3d at 662 (discussing former Tex. Rev. Civ. Stat. art. 4509i, *repealed by* Act of June 2, 2003, 78th Leg., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884); *Drewery*, 2011 Tex. App. LEXIS 3895, at *9; *see* Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(13). There is no dispute that Cardwell is a physician, such that the first element is satisfied. *See id.* § 74.001(a)(23) ("[p]hysician means . . . an individual licensed to practice medicine in this state"). But the remaining two elements require further analysis.

10

Under the second element, our focus, the statutory text indicates, is the nature of McDonald's "cause of action" against Cardwell. *See id.* § 74.001(a)(13). Although the Legislature did not define "cause of action" in the TMLA, the Texas Supreme Court has observed that the phrase denotes the existence or alleged existence of "a fact or facts entitling one to institute and maintain an action, which must be proved in order to obtain relief" or a "group of operative facts giving rise to one or more bases for suing; a factual situation that entitles one person to obtain a remedy in court from another person." *In re Jorden*, 249 S.W.3d 416, 421 (Tex. 2008) (orig. proceeding) (quoting *A.H. Belo Corp. v. Blanton*, 129 S.W.2d 619, 621 (Tex. 1939); Black's Law Dictionary 235 (8th ed. 2004)); *see Certified EMS, Inc. v. Potts*, No. 01-10-00106-CV, 2011 Tex. App. LEXIS 3817, at *18-19 (Tex. App.—Houston [1st Dist.] May 19, 2011, pet. filed) (op. on reh'g) (making the same observation). Consequently, the Legislature's use of "cause of action" signals that we are to look to whether McDonald's right of relief against Cardwell is predicated on certain types of facts, not to the particular legal theories on which McDonald might purport to rely. *Certified EMS, Inc.*, 2011 Tex. App. LEXIS 3817, at *18-20. The Legislature makes this further explicit in emphasizing that "whether the claimant's claim or cause of action sounds in tort or contract" is not what controls whether the cause of action is an HCLC. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.001(13). *See also In re Jorden*, 249 S.W.3d at 421-22 (similarly observing that because a "cause of action" derives from the presence of certain types of facts, its existence does not depend on whether suit has actually been filed).

For McDonald's cause of action to constitute an HCLC, therefore, the facts on which it is predicated must concern "treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly

11

related to health care." *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.001(13).  Cardwell's dismissal motion was premised on the assertion that McDonald's suit is substantively a cause of action regarding "medical care" or "health care"—specifically, a complaint that Cardwell communicated to Brian a "mis-diagnosis" or incorrect evaluation of McDonald's psychological condition in the course of treating Brian.[14]  The TMLA defines "medical care" as "any act defined as practicing medicine under Section 151.002, Occupations Code, performed or furnished, or which should have been performed, by one licensed to practice medicine in this state for, to, or on behalf of a patient during the patient's care, treatment, or confinement."  Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(19).  The occupations code, in turn, defines "practicing medicine" in relevant part as "the diagnosis, treatment, or offer to treat a mental or physical disease or disorder or a physical deformity or injury by any system or method, or the attempt to effect cures of those conditions, by a person who . . . publicly professes to be a physician."  Tex. Occ. Code Ann. § 151.002(13) (West Supp. 2010).  "Health care," on the other hand, is somewhat broader than "medical care," encompassing "any act or treatment performed or furnished, or that should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement."  Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(10).  "Accepted standards" of "medical care" or, alternatively, "health care," refers to the body of specialized professional standards that define the duties owed by providers of such care in lieu of general tort duties.  *See Marks*, 319 S.W.3d at 662; *Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842,

---

[14]  Consequently, we do not address whether or the extent to which McDonald's allegations implicate "safety or professional or administrative services directly related to health care."

12

850 (Tex. 2005) (discussing former Tex. Rev. Civ. Stat. art. 4509i); *Sorkolit v. Rhodes*, 889 S.W.2d 239, 242 (Tex. 1994) (same).

Our inquiry, then, focuses on whether the facts McDonald alleged as the basis for relief against Cardwell implicate Cardwell's specialized professional duties in providing "diagnosis, treatment, or offer to treat a mental or physical disease or disorder . . . or injury by any system or method, or the attempt to effect cures of those conditions," or any other "act or treatment performed or furnished, or that should have been performed or furnished, by any health care provider," "for, to, or on behalf of" Brian during Brian's "care" or "treatment." *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(10), (19); Tex. Occ. Code Ann. § 151.002(13). In making this determination, we look to whether "the act or omission complained of is an inseparable part of the rendition of medical services." *Diversicare Gen. Partner, Inc.*, 185 S.W.3d at 848. We are to consider such factors as whether a specialized standard in the health-care community applies to the circumstances in question and whether the alleged acts or omissions involve medical judgment related to the patient's care or treatment. *See id.* at 847-52; *Drewery*, 2011 Tex. App. LEXIS 3895, at \*10-11. The necessity of expert testimony from a medical professional to prove a cause of action may also be an important factor in determining whether the acts or omissions are an inseparable part of the rendition of medical services. *Diversicare Gen. Partner, Inc.*, 185 S.W.3d at 851; *Drewery*, 2011 Tex. App. LEXIS 3895, at \*10-11.

Consistent with the TMLA's focus on facts rather than legal theories, moreover, the Texas Supreme Court has repeatedly emphasized that courts are to look to the "underlying nature," "essence," or "gravamen" of the cause of action rather than the manner in which it is pleaded. *Yamada v. Friend*, 335 S.W.3d 192, 197 (Tex. 2010); *Diversicare Gen. Partner, Inc.*, 185 S.W.3d

13

at 847; *see also Yamada*, 335 S.W.3d at 196 (adding that "[a]rtful pleading does not alter that nature"). "[W]e focus on the essence of [the plaintiff's] claim and consider the alleged wrongful conduct and the duties allegedly breached, rather that the unfortunate injuries [the plaintiff] suffered." *Diversicare Gen. Partner, Inc.*, 185 S.W.3d at 851. A further implication or extension of the foregoing principles, the Texas Supreme Court has held, is that a plaintiff cannot avoid the TMLA's requirements by purporting to assert a non-HCLC[15] based on the same underlying facts that also give rise to an HCLC. *Yamada*, 335 S.W.3d at 196-98; *accord Turtle Healthcare Grp., L.L.C. v. Linan*, 337 S.W.3d 865, 868-69 (Tex. 2011) (per curiam). To hold otherwise, the supreme court has reasoned, would invite plaintiffs to "split or splice[]" HCLCs "into a multitude of other causes of action with different standards of care, damages, and procedures . . . contraven[ing] the Legislature's explicit requirements." *Yamada*, 335 S.W.3d at 197-98 (citing *Diversicare Gen. Partner, Inc.*, 185 S.W.3d at 854).

Applying these standards to the record here, we conclude that McDonald has asserted, at least in part, an HCLC. The context of McDonald's factual allegations against Cardwell—as she acknowledges in her pleadings, and which is further detailed in the undisputed evidence—centers on a "treatment session" between Brian and Cardwell in which she participated. In part, McDonald complains, in essence, that Cardwell provided Brian an incorrect diagnosis or assessment of her as suffering from "progressive paranoid thought disorder," proximately causing her injury. These facts come within "the diagnosis [of] . . . a mental or physical disease or disorder . . . by any system or method" or other "act or treatment performed or furnished" by Cardwell "for, to, or on behalf of"

---

[15] That is, a cause of action other than an HCLC.

14

Brian during Brian's "care" or "treatment." *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(10), (19); Tex. Occ. Code Ann. § 151.002(13). And whether or not that diagnosis or assessment was made appropriately, correctly, or accurately would plainly be an "inseparable" part of the rendition of those medical services, implicating the specialized standards of care applicable to physicians (or psychiatrists in particular) and requiring the testimony of a medical expert to ascertain whether those governing standards were breached. *See Diversicare Gen. Partner, Inc.*, 185 S.W.3d at 847-52. McDonald would necessarily have to present expert testimony to establish what a prudent psychiatrist in Cardwell's position would have done in the same situation. *See Garland Cmty. Hosp. v. Rose*, 156 S.W.3d 541, 545-46 (Tex. 2004) (holding that a negligent-credentialing claim involves departure from a specialized standard of care and therefore required expert testimony); *Watts v. Rodriguez*, No. 03-06-00092-CV, 2008 WL 1753564, at *2 (Tex. App.—Austin Apr. 18, 2008, no pet.) (mem. op.) (holding expert testimony would be required to establish what a prudent medical professional would have done in same situation when plaintiff alleged that assistant surgeon was engaged in joint enterprise with surgeon during allegedly negligent surgery). Expert testimony would also be required to show that Cardwell's diagnosis of McDonald was incorrect.

McDonald disputes that Cardwell's diagnosis or assessment of her, as opposed to Brian, could be "integral" to his provision of "medical care" or "health care" because it is undisputed that she was never a patient of Cardwell's—only Brian was. Relatedly, McDonald questions whether she, as a non-patient, could be a "claimant" asserting an HCLC, because HCLCs are predicated on the breach of professional duties owed to patients. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 74.001(a)(10), (19) (defining "medical care" and "health care" in terms of acts "for, to, or on behalf of" a patient). We conclude that the conceded absence of a physician-patient

15

relationship between Cardwell and McDonald is not singularly dispositive under the Legislature's definition of an HCLC.

The psychological condition of McDonald—Brian's wife as well as a fellow participant in their business—would tend to impact Brian's own well-being. The manner in which Cardwell assessed McDonald's condition "for, to, or on behalf of Brian" would thus implicate the professional duties Cardwell owed to Brian as his psychiatrist. While McDonald emphasizes that she cannot assert a claim for professional negligence against Cardwell predicated on his breach of these duties, as there was no doctor-patient relationship between them,[16] the Legislature has not limited the class of potential HCLC claimants solely to aggrieved patients or persons claiming by or through them. *See id.* § 74.001(a)(2) ("claimant" is "*a person*, *including* a decedent's estate, seeking or who has sought recovery of damages in a health care liability claim.") (emphasis added), (13) (HCLC is a "cause of action" predicated on acts or omissions in regard to a patient "which proximately result[] in injury to or death of *a claimant*") (emphasis added); *see also* Tex. Gov't Code Ann. § 311.005(13) (West 2005) ("'[i]ncludes' and 'including' are terms of enlargement and not of limitation or exclusive enumeration, and use of the terms does not create a presumption that components not expressed are excluded."); *DeQueen*, 325 S.W.3d at 635 (we presume that the Legislature chose its words deliberately and purposefully). Under the TMLA, in other words, a plaintiff asserts an HCLC if he or she claims injury that is proximately caused by conduct that would constitute a breach of a physician or health care provider's specialized duty of care

---

[16] *See St. John v. Pope*, 901 S.W.2d 420, 424 (Tex. 1995) (affirming summary judgment in favor of defendant physician on ground that absent physician-patient relationship, physician owed no duty to plaintiff).

to a patient. That occurred here, and the decisions of our sister courts illustrate other examples of circumstances where non-patients have similarly been held to have asserted HCLCs. *See Fudge v. Wall*, 308 S.W.3d 458, 462-64 (Tex. App.—Dallas 2010, no pet.) (suit against professional counselor by father and grandparent of child seeking damages arising from counselor's opinion that child had been sexually abused by father; suit held to be HCLC because rooted in counselor's provision of health care to child and mother); *Buchanan v. O'Donnell*, No. 04-10-00292-CV, 2011 Tex. App. LEXIS 1301, *2-3, 7-8 (Tex. App.—San Antonio Feb. 23, 2011, no pet.) (third-party plaintiff injured in auto accident with hospital employee asserted HCLC against hospital and physicians by alleging that defendants had improperly prescribed or administered drugs to employee); *Wilson N. Jones Mem'l Hosp. v. Ammons*, 266 S.W.3d 51, 60-62 (Tex. App.—Dallas 2008, pet. denied) (non-patient hospital visitor sued hospital for injuries caused by hospital patient; claim held to constitute HCLC because rooted in "health care" hospital provided to patient).[17]

---

[17] McDonald cites us to no authority, and we are aware of none, holding that only patients may assert HCLCs. The closest McDonald comes is *Pallares v. Magic Valley Electric Cooperative, Inc.*, 267 S.W.3d 67 (Tex. App.—Corpus Christi 2008, pet. denied). *Pallares* involved a suit by a self-insured business alleging that a physician had fraudulently billed it for treatment administered to a beneficiary of its health plan. The court of appeals held that the business's suit was not an HCLC. *Id.* at 74-75. In emphasizing what it perceived to be a remote, tangential connection between medical care or health care and the acts or omissions made the basis of the business's claim, the court at one point observed that the physician "did not provide treatment to Magic Valley itself." *Id.* at 74. However, the focus of the court's analysis is on demonstrating that the alleged fraudulent billings did not implicate the sorts of duties whose breach characterizes an HCLC. *Id.* Nothing in *Pallares* suggests that a non-patient could never assert an HCLC and, in fact, the court's focus on the nature of the claim may imply the affirmative. *See id.*

We also acknowledge that courts—including the Texas Supreme Court—have sometimes referred to the third element of an HCLC in terms of the "patient's" injuries rather than the broader "claimant's" injuries that the Legislature used, but such shorthand descriptions are explained by their context—the courts are addressing claims asserted by a patient. *See Marks v. St. Luke's Episcopal Hosp.*, 319 S.W.3d 658, 662 (Tex. 2010) (plurality op.); *Drewery v. Adventist Health Sys./Tex., Inc.*,

McDonald urges that this construction of the TMLA creates a "Catch-22" in which she can neither assert a medical-malpractice claim against Cardwell regarding the diagnosis (because he owed no physician-patient duty of care to her) nor obtain the expert report necessary to pursue any other theory of liability against him based on those facts. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6) ("'expert report' means a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed"). To the contrary, McDonald could have pursued her non-negligence theories of liability against Cardwell if she had obtained an expert report setting forth Cardwell's professional negligence in making and providing the diagnosis to Brian. *See id.* This is not the only instance in which the Legislature has required an expert report regarding a professional's negligence duties as a prerequisite to pursuing a broader class of liability theories. *See S & P Consulting Eng'rs, PLLC v. Baker*, 334 S.W.3d 390, 392 (Tex. App.—Austin 2011, no pet.) (en banc) (under chapter 150 of the civil practice and remedies code, a certificate of merit asserting negligent acts of a design professional is a prerequisite to pursuing any claim against such defendants, including those based on non-negligence theories of liability). As in *Baker*, we are bound to give effect to the statute the Legislature has enacted.

McDonald also insists that her complaint that Cardwell incorrectly diagnosed or assessed her mental state must be viewed in the context of her additional allegations that Cardwell misled her regarding the purpose of the treatment sessions she attended and that he was seeking

---

No. 03-10-00334-CV, 2011 Tex. App. LEXIS 3895, at *9 (Tex. App.—Austin May 20, 2011, pet. filed).

to garner or generate evidence to aid Brian in divorce litigation. These arguments serve to highlight that McDonald's liability theories are, to this extent, based on the same underlying facts that constitute an HCLC. Under *Yamada* and its progeny, McDonald was required to serve an expert report concerning Cardwell's allegedly incorrect or wrongful assessment of her mental state for Brian in order to pursue any liability theories predicated on those facts. 335 S.W.3d at 196-98; *accord Turtle Healthcare Grp., L.L.C.*, 337 S.W.3d at 868-69.[18] Because she served no such report, her suit must, to this extent, be dismissed, *see* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(b).

Cardwell urges that *Yamada* requires dismissal of McDonald's entire suit. On this record, we disagree. While McDonald's liability theories are largely predicated on factual allegations implicating Cardwell's professional duties to Brian in correctly diagnosing McDonald and communicating the diagnosis, thus constituting an HCLC—and are thus not actionable due to her failure to serve an expert report—they also rest upon a separate, distinct cause of action that does not overlap with the HCLC. If we exclude the factual allegations underlying McDonald's HCLC, her remaining allegations complain, in essence, that even if Cardwell had ultimately been correct in his diagnosis of her mental condition and acted properly in communicating that opinion to Brian, Cardwell nonetheless misled her in securing her participation in treatment sessions where he actually intended to gather or generate evidence against her. Although the Texas Supreme Court has yet to clearly delineate the circumstances when a claimant who asserts a cause of action constituting an HCLC might also assert a separate cause of action that is potentially not an HCLC, a recent majority of the court has tacitly recognized that it can occur. *See Marks*, 319 S.W.3d at 660-64 (plurality op.,

---

[18] We note that these cases were decided after the district court's order on appeal.

Medina, J., joined by Hecht, J.) (distinguishing HCLCs predicated on hospital acts and omissions related to "patient supervision and staff training" from complaint about condition of hospital bed, which it separately analyzed and ultimately held to be an HCLC); *id.* at 674, 674-75 & n.2 (Jefferson, C.J., dissenting, joined by Green, Guzman, and Lehrmann, JJ.) (distinguishing the patient-supervision and staff-training claims from the bed-related claim and urging that the latter was not an HCLC); *cf. id.* at 667, 667-69 (Johnson, J., concurring, joined by Willett, J.) (urging that "Marks's claim is based on a single incident and is substantively a health care liability claim in its entirety"); *id*. at 666-67 (Wainwright, J., concurring) (agreeing with Justice Johnson on this point). Those sort of circumstances, in our view, exist here.

As for whether McDonald's separate cause of action based on misleading conduct in securing her participation in the treatment sessions is an HCLC, it is conceivable that a physician or health care provider could demonstrate a nexus between the complained-of conduct and the professional duties of a physician or health care provider and show that the complained-of conduct constitutes an HCLC. However, the appellate record contains no indication that Cardwell raised such an argument in the district court. To the contrary, his dismissal motion was predicated exclusively on the assertion that McDonald was suing over a "misdiagnosis" that was improperly communicated to Brian. On this record, we cannot conclude that the district court abused its discretion in denying Cardwell's dismissal motion as to this separate cause of action.

## CONCLUSION

To the extent that McDonald asserts a claim for relief that is predicated on her allegations that Cardwell incorrectly diagnosed or assessed her mental condition or acted wrongfully

20

in communicating that opinion to Brian, that claim must be dismissed due to McDonald's failure to serve an expert report. Cardwell would also be entitled to an award of reasonable attorney's fees and costs incurred in defending that claim. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(b). However, to the extent that McDonald asserts a claim based on separate, non-HCLC allegations that Cardwell misled her in securing her participation in treatment sessions where he actually intended to gather or generate evidence against her, the district court did not err in denying Cardwell's motion.[19] Accordingly, we will affirm the district court's order in part, reverse it in part and remand for further proceedings consistent with this opinion.

_____

Bob Pemberton, Justice

Before Justices Puryear, Pemberton and Rose

Affirmed in part; Reversed and Remanded in part

Filed:   August 31, 2011

---

[19]   We emphasize, again, that the merits of these allegations and liability theories are not before us now. We express no opinion regarding their ultimate viability.